AUSA:   K. Criag Welkener        Telephone:  (313) 269-4796
Special Agent:      Kevin Clark        Telephone:  (313) 378-7149

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Seizure of ) 
*(Briefly describe the property to be seized)* )
2023 Audi Q3, VIN: WA1EECF36P1144452, and all sets ) 
of keys and operating manuals used to operate the vehicle )
)

Case No.    2:25-mc-50997-2
Judge: Lawson, David M.
Filed: 07-29-2025

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___Southern___ District of ___Florida___ is subject to forfeiture to the United States of America under _____ U.S.C. § ___See Below___ *(describe the property)*:

18 U.S.C. §§ 981 (a)(1)(A) and (C), 18 U.S.C. §§ 982(a)(1) and (7), 18 U.S.C. § 1956(c)(7)(F), and 28 U.S.C. § 2461(c) - 2023 Audi Q3, VIN: WA1EECF36P1144452, and all sets of keys and operating manuals used to operate the vehicle

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Kevin Clark
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date:    July 29, 2025

_____
*Judge's signature*

City and state:   Detroit, MI

Elizabeth A. Stafford        U. S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Kevin Clark, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## EXECUTIVE SUMMARY

1.     **Target Assets:** This affidavit is submitted in support of the government's application for the issuance of seizure warrants for the following assets, collectively referred to as the **Target Assets**.

**A. All funds on deposit in Truist Bank Account 1100031801794, held in the name of FAST LAB TECHNOLOGIES LLC (Operating Account)**

**B. All funds on deposit in Truist Bank Account 1100031801808, held in the name of FAST LAB TECHNOLOGIES LLC (Government Account)**

**C. All funds on deposit in Truist Bank Account 1100031801816, held in the name of FAST LAB TECHNOLOGIES LLC (Payroll Account)**

**D. All funds on deposit in Truist Bank Account 1100031802316, held in the name of FAST DOC LLC (Operating Account)**

**E. All funds on deposit in Truist Bank Account 1000209771798, held in the name of CEMHAN BIRICIK or ISABEL BIRICIK**

**F. All funds on deposit in JP Morgan Chase Brokerage/Securities Account 985-10771, held in the name of FAST LAB TECHNOLOGIES LLC**

**G. All funds on deposit in JP Morgan Chase Bank Account 725611005, held in the name of Zenith Business Advisory Solutions Inc.**

**H. All funds on deposit in JP Morgan Chase Bank Account 738547733, held in the name of Hasan Seyhun**

1

**I.** **All funds on deposit in JP Morgan Chase Bank Account 944733500, held in the name of Hasan Seyhun**

**J.** **All funds on deposit in JP Morgan Chase Bank Account 759192609, held in the name of Soho Workspaces 2 Inc.**

**K.** **All funds on deposit in JP Morgan Chase Bank Account 582305663, held in the name of Soho Workspaces 2 Inc.**

**L.** **All funds on deposit in JP Morgan Chase Bank Account 738295598, held in the name of Hasan Seyhun**

**M.** **All funds on deposit in Sun Trust Bank Account 1000202882295, held in the name of CEMHAN BIRICIK or ISABEL BIRICIK**

**N.** **All funds on deposit in Robinhood Account 825420938, held in the name of CEMHAN BIRICIK,**

**O.** **All funds on deposit in Morgan Stanley Account 730-091145, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN**

**P.** **All funds on deposit in Morgan Stanley Account 730-091585, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN**

**Q.** **All funds on deposit in Morgan Stanley Account 730-091785, held in the name of CEMHAN BIRICIK**

**R.** **All funds on deposit in Bank of America Account 009439190411, held in the name of Martin Perlin M.D.**

**S.** **All funds on deposit in Social Financial Bank Account 411033934602, with Cemhan Biricik listed as the primary account holder and Isabel Biricik as a joint Account holder**

**T.** **All funds on deposit in Social Financial Bank Account 310043217728, with Cemhan Biricik listed as the primary account holder and Isabel Biricik as a joint Account holder**

2

**U. 2022 Ford Bronco Raptor (VIN: 1FMEE5JR1NLA50344)**

**V. 2022 Ford Bronco Sport (VIN: 3FMCR9C69NRE24285)**

**W. 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960)**

**X. 2023 Bentley Bentayga (VIN: SJAAR2ZVXPC023963)**

**Y. 2023 Lamborghini Urus (VIN: ZPBUC3ZLXPLA25853)**

**Z. 2023 Audi Q3 (VIN: WA1EECF36P1144452)**

**AA.   2024 BMW M4 (VIN: WBS33BA02RCP10794)**

**BB.   2025 Cirrus SR22T aircraft, bearing tail number 203FD, S/N: 10395, including all sets of keys and associated documents, including but not limited to aircraft logbooks (engine, propeller and aircraft/airframe, flight logs, and maintenance logs), registration papers, sales receipts, FAA documentation, airworthiness certificate, radio license, and pilot operating handbook.**

The **Target Assets** constitute a portion of the proceeds of a health care fraud and money laundering scheme that resulted in over $51 million in Medicare, Medicaid, and private insurance funds being fraudulently reimbursed to FAST LAB TECHNOLOGIES LLC between January 2021 and present, and dispersed across bank accounts, real property, vehicles, and an airplane.

2.     **The Criminal Case**: Defendants Cemhan Biricik and Dr. Martin Perlin were charged in this Court last week via a sealed indictment, for a nationwide healthcare fraud conspiracy.  Criminal Case No. 25-cr-20543, ECF 1.  In short, Defendants shipped packets of COVID-19 tests to individuals, then repeatedly billed

their insurance companies *upon shipment* as though antigen or "rapid" tests were performed under the direct supervision of medical staff—when they were not—and as though PCR or "laboratory" tests were returned by consumers and lab-tested— when they were not. *Id.* Federal investigators from over 10 agencies are involved in the ongoing investigation.  For an overview of the criminal allegations, see Affidavit pages 12-46.

3. **The Financial Tracing:**  Over $51 million in actual fraud proceeds resulted from this scheme. This seizure warrant application seeks authorization to seize or freeze the Target Assets—personal property and funds on deposit in various bank accounts—that are either proceeds of this ongoing offense, or property involved in laundering of those proceeds.  In Affidavit pages 47-108, we explain how the fraud proceeds moved through the Target Asset bank accounts and into purchases of Target Asset vehicles/airplane, including via money laundering transactions pursuant to 18 U.S.C. 1956 (money laundering that conceals proceeds or advances the underlying criminal operation) and 18 U.S.C. § 1957 (transactions involving more than $10,000 in criminal proceeds). Financial tracing relevant to specific assets can be found at Affidavit pages 60-108.

## INTRODUCTION AND AGENT BACKGROUND

4. I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such

since January 6, 2019.  As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, wire fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations.  I have interviewed numerous self-proclaimed drug users, medical doctors, and owners and employees of medical clinics.  I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers.  I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.  I am currently assigned to the Detroit Division of the FBI, and my duties include investigating health care fraud and prescription drug diversion

5.     Based on my training, experience, and participation in financial investigations involving the concealment of funds and assets in order to prevent detection by law enforcement agencies, I have observed that:

    a.   Individuals involved in illegal activities often generate large amounts cash and money through those activities.  These individuals often use the cash and money to facilitate the operation of their illegal activities by disguising fund transfers to close associates as legitimate income payments, and purchasing legitimate personal items, such as housing, cars, jewelry, and clothing.

b. Individuals attempting to conceal their income or illegal activities frequently transfer assets to friends, relatives, or close associates to avoid detection of those assets by the IRS and other government agencies.  Even though such assets are in the names of others, the true owners of the assets typically continue to exercise dominion and control over these assets.

c. Individuals involved in illegal activities often use banks to conduct financial transactions involving proceeds of their criminal activities. Such individuals often establish multiple businesses and transfer funds between accounts to disguise the nature, source, ownership, control, and location of criminal proceeds, and to make their wealth appear to have been obtained legitimately.  Such individuals also often commingle their criminal proceeds with legitimate funds in bank accounts or other financial accounts in order to conceal the illegal source of their criminal proceeds.

I refer to these methods that criminals often use to conceal the nature, source, ownership, control, and location of their criminal proceeds as "money laundering."

6.      As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud), Section 1349 (Conspiracy to Commit Health Care Fraud) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering).  I have participated in the execution of search warrants for documents and other evidence as well as seizure warrants in cases involving violations of these offenses.

7.      As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, including information provided to me

6

by other law enforcement agents and government contractors and upon my experience and background as an FBI Special Agent. This affidavit is intended to show merely that sufficient probable cause exists for the requested seizure warrants and does not set forth all of my knowledge about this investigation.

8.      Based upon my training and experience, and the information set forth in this affidavit, there is probable cause to believe that the Target Assets constitute: (a) the proceeds of illegal activity, and/or property traceable to proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. § 1347 and conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; (b) the gross proceeds of illegal activity, and/or property traceable to gross proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1347; and/or, (c) property involved in, or traceable to property involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. As such, these funds are subject to seizure and civil and/or criminal forfeiture pursuant to 18 U.S.C. §§ 981 (a)(1)(A) and (C), 18 U.S.C. §§ 982(a)(1) and (7), 18 U.S.C. § 1956(c)(7)(F), and 28 U.S.C. § 2461(c).

## **APPLICABLE STATUTES**

9.      **Substantive Criminal Law:** as detailed below, federal law criminalizes healthcare fraud, conspiracy to commit healthcare fraud, and money laundering (including transactions that conceal or advance the unlawful activity, or

transactions in criminal proceeds that exceed $10,000).

10.    Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

11.    Title 18, United States Code, Section 1343, prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

12.    Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347 and 18 U.S.C. § 1343,

8

respectively.

13.     Title 18, United States Code, Section 24(b), defines a "health care

benefit program" as, among other things, "any public or private plan . . . affecting

commerce, under which any medical benefit, item, or service is provided to any

individual, and includes any individual or entity who is providing a medical benefit,

item, or service, for which payment may be made under the plan."

14.     Title 18 of the United States Code, Section 1956 prohibits engaging in

certain monetary transactions in property derived from specified unlawful activity:

(a)(1) Whoever, knowing that the property involved in a financial transaction

represents proceeds of some form of unlawful activity, conducts or attempts to

conduct such a financial transaction which in fact involves the proceeds of specified

unlawful activity –

(A) with the intent to promote the carrying on of a specified unlawful activity;

or …

(B) knowing that the transaction is designed in whole or in part to conceal or

disguise the nature, the location, the source, the ownership or control of the

proceeds of specified unlawful activity…

shall be sentenced to a fine of not more than $500,000 or twice the value of

the property involved in the transaction, whichever is greater, or

imprisonment for not more than twenty years, or both.

9

15.     Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

16.     Title 18, United States Code, Section 1956, sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

17.     **Applicable Forfeiture Statutes**: as detailed below, federal law provides for the civil and/or criminal forfeiture of any property that is either proceeds of specified unlawful activities (including healthcare fraud), or property involved in money laundering offenses.

1.     18 U.S.C. § 981 Civil Forfeiture

(a) (1) The following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

                *          *          *          *

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

10

(b)(1)  Except as provided in section 985, any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

(b)(2)  Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure . . . .

(b)(3)  Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

2.   18 U.S.C. § 982 Criminal Forfeiture

(a)(1)  The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

(a)(7)  The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3.   18 U.S.C. § 984   Civil Forfeiture of Fungible Property

(a)(1)  In any forfeiture action in rem in which the subject property is … funds deposited in an account in a financial institution . . .

11

(A)           it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

4.      In addition, the law provides that where civil forfeiture is available for a criminal offense, criminal forfeiture is available as well.  28 U.S.C. § 2461(c) ("If a person is charged in a criminal case with a violation of an Act of Congress for which civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure.  If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case.")

## THE CRIMINAL CASE

### *Overview*

5.      Numerous agencies are investigating a health care fraud scheme involving BIRICIK and his company FAST LAB TECHNOLOGIES, LLC ("FAST LAB"), including the following entities: the FBI, the Department of Health and Human Services Office of Inspector General (HHS-OIG), the U.S. Office of Personnel Management (OPM-OIG), the Department of Labor - Employee Benefit Security Administration and Office of Inspector General (DOL-EBSA, DOL-OIG),

the Internal Revenue Service – Criminal Investigation Division (IRS-CI), the United States Postal Inspection Service (USPIS), and the Department of Defense Office of Inspector General, Defense Criminal Investigative Service (DCIS).  The fraudulent scheme involves FAST LAB providing at-home tests for the SARS-CoV-2 virus (commonly known as the COVID-19 ("COVID")) to those seeking "free" tests. FAST LAB solicited COVID tests to prospective beneficiaries via several methods including but not limited to search engine optimized internet searches and pop-up advertisements directing them to fastlabtech.com.  The beneficiary is required to enter their name, address, email, phone number and insurance information into the fastlabtech.com webpage.  FAST LAB mailed the beneficiary two types of test kits (discussed further below): antigen or "rapid" tests and PCR or "laboratory" tests. The antigen test included instructions to log into a web portal for virtual observation of the test and clinician review of the results; the PCR test included instructions to provide a saliva sample in a vial and send the sample back to FAST LAB for analysis to ascertain if the individual had tested positive or negative for COVID. Based on interviews, upon receipt of the test kits, most beneficiaries did not log into the portal (and thus were not observed) when using the antigen tests, if they were used at all; similarly, most beneficiaries merely set the PCR tests aside and did not return a sample for testing.

6.      Regardless of whether or not FAST LAB received a sample back from

13

these beneficiaries, BIRICIK, through FAST LAB, submitted false and/or fraudulent claims to Medicare, Medicaid, TRICARE, and/or private insurance companies seeking reimbursement for laboratory services as though FAST LAB had received the sample and performed the PCR testing; in reality, those tests were often never processed. Likewise, BIRICIK, through FAST LAB, submitted false and/or fraudulent claims for the antigen tests, representing that all of the tests had been done under "direct observation" of medical staff; in reality, many antigen tests were never taken, and even fewer were done under any kind of observation.

Since December 2021, FAST LAB has billed Medicare Part B approximately $180 million for COVID laboratory testing codes and has been paid approximately $16 million. FAST LAB has also billed Medicare Part C approximately $228 million for COVID laboratory testing codes and has been paid approximately $20 million. Further analysis of nationally reported Medicaid data indicates that FAST LAB has billed Medicaid approximately $56 million for COVID laboratory testing codes and has been paid approximately $6.4 million.

7. In addition, BIRICIK has spent proceeds of the fraud on a number of high-end purchases, to include the purchase of high-end automobiles and BIRICIK's residence, located at 9623 Macchiato Avenue, Boca Raton, Florida 33469 ("BIRICIK's Floria residence").

8. I, your affiant, believe that BIRICIK is FAST LAB's Founder, Owner,

14

Chief Executive Officer (CEO), Authorized Official, and Contracted Managing Employee.

9.      Based on FAST LAB's website, www.fastlabtech.com, the FAST LAB Corporate Headquarters is located at **Subject Premises 1**.  Based on Grand Jury returns, FAST LAB maintains items in storage units at **Subject Premise 2** and **Subject Premises 3**.

*Background*

A.      **RELEVANT INDIVIDUALS AND ENTITIES**

10.     According to Medicare enrollment records filed with the Medicare contractor on January 18, 2022, FAST LAB operates as an independent clinical laboratory and purports to provide laboratory services with BIRICIK listed as FAST LAB's owner and authorized official.  According to company records filed with the State of Wyoming, Secretary of State, FAST LAB was formed as an LLC on September 14, 2021.  Additional FAST LAB records filed with the State of Wyoming, Secretary of State have BIRICIK listed as its CEO, and its location was 1178 Broadway, Suite 401, New York, NY 10012.  As of July 9, 2025, FAST LAB's online website homepage listed its corporate headquarters as 215 Water Street, Brooklyn, NY 11201 - **Subject Premises 1**.

11.     To participate in Medicare, providers are required to submit applications in which the providers agree to comply with all Medicare-related

15

policies and procedures, rules, and regulations issued by Centers for Medicare & Medicaid Services ("CMS) and its agents and contractors, including those governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims.

12.    CMS received an initial Medicare Enrollment application (commonly referred to as an 855b) from FAST LAB.  The 855b was filed on behalf of FAST LAB on January 18, 2022.

13.    On February 8, 2022, and June 30, 2022, BIRICIK signed and agreed to the terms of an Electronic Data Interchange (EDI) Agreement Form, in which BIRICIK agreed to submit claims that were accurate, complete, and truthful. Under condition 11 of the EDI Agreement, BIRICIK acknowledged that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law.

14.    A USPIS postal database check completed on or around June 5, 2025 identified Extra Space Storage used USPS to mail a letter to **Subject Premises 1**.

15.    A Google search for "Fast Lab Technologies LLC New York" yielded an address of "215 Water St, Brooklyn, NY 11201."

16

16.    During a secondary examination interview with the United States Customs and Border Protection (CBP), BIRICIK stated that he currently owns a "tremendously successful" medical testing company named FAST LAB.  BIRICIK added that FAST LAB is based in "215 Water St, Brooklyn, NY 11201," and that he works remotely and handles all matters regarding the company while living in Florida.

**B.       COVID-19 BILLING & TESTING**

17.    The onset of the COVID pandemic brought with it an urgent need to test individuals for COVID.  As a result, on March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127.  The FFCRA required health plans and insurers to cover COVID tests and testing in certain qualifying situations.

18.    On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136.  Section 3203 of the CARES Act ensured that "group health plans" and "health insurance issuers" provided coverage for "any qualifying coronavirus preventive service."

19.    There were two main categories of COVID tests: (i) "antigen" tests (often referred to as "rapid" tests), and (ii) Polymerase chain reaction ("PCR") tests (often referred to as "laboratory" tests).

20.    Antigen tests allowed for quick results wherein the specimen collection

17

(via nasal swab), specimen analysis, and test results are all administered at the same location.

21.     COVID PCR tests involved health care workers collecting a nasal swab or saliva tube from a patient.  These samples were then exposed to a chemical primer that would attach to key parts of the COVID genetic structure – if it was present in the patient's sample – and allowed just the COVID genes to duplicate. A dye was also added to the sample that provided a marker that showed the successful duplication of COVID genetic structures.  In this way, even small traces of the COVID virus could be detected.

22.     Insurance coverage for COVID PCR tests were available through both public and private "health care benefit programs" (as defined in Title 18, United States Code, Section 24(b)), including Medicare, Medicaid, and private health care benefit programs, to include Blue Cross Blue Shield, Aetna, and others.  Health care benefit programs are often referred to as "health insurance."

23.     In order for BIRICIK, through FAST LAB, to be paid by these health care benefit programs for the COVID PCR tests, FAST LAB had to submit claims for reimbursement to the individual patient's health care benefit program/health insurance.

24.     These claims included, among other things, the name of the patient, the date of service, and the service rendered.  In the case of FAST LAB, the purported

"service rendered" was the laboratory analysis of the COVID PCR test.

25.     When seeking reimbursement from health care benefit programs for provided services or items, providers submitted the cost of the benefit, service, or items provided together with a description and the appropriate "procedure code", as set forth in the Current Procedural Terminology (CPT) or the Healthcare Common Procedure Coding System (HCPCS).  Additionally, claims submitted to health care benefit programs seeking reimbursement were required to include: (i) the beneficiary's name; (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known as the National Provider Identifier ("NPI").  BIRICIK and FAST LAB utilized the five CPT codes with the highest rate of reimbursement listed below to bill for laboratory analysis of purported COVID PCR tests:

| CPT/HCPCS Code | Description |
| --- | --- |
| U0003 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]), amplified probe technique, making use of high throughput technologies |

19

| U0005 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-COV-2) (Coronavirus disease (COVID-19)), amplified probe technique, CDC or non-CDC, making use of high throughput technologies, completed within two calendar days from date and time of specimen |
| --- | --- |
| G2023 | Specimen collection for severe acute respiratory syndrome coronavirus 2 (sars-cov-2) (coronavirus disease [covid-19]), any specimen source |
| 87635 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]), amplified probe technique |
| 87811 | Infectious agent antigen detection by immunoassay with direct optical (ie, visual) observation; severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]) |

26.    By submitting claims using these CPT codes, BIRICIK, through FAST LAB represented that the services associated with those codes had been performed

20

and that he was entitled to reimbursement for the services.

27.     Separately, from April 4, 2022, to May 11, 2023, Medicare paid for the provision of COVID test kits pursuant to the over-the-counter COVID test demonstration.  Health care providers <u>were</u> able to bill for the provision of over-the-counter COVID test kits by using CPT code K1034 (Provision of COVID-19 test, nonprescription self-administered and self-collected use, FDA approved, authorized or cleared, one test count).  However, beginning on May 12, 2023, Medicare no longer covered or paid for over-the-counter COVID test kits.  Medicare beneficiaries still had access to laboratory-conducted COVID tests (like PCR tests), even after the COVID public health emergency ended.  Medicare beneficiaries would continue to get these lab-conducted tests at no cost—and their annual deductible, coinsurance, and copayment did not apply because Medicare covered a variety of outpatient services, including medically necessary clinical diagnostic laboratory tests—but did not cover or pay for over-the-counter services and tests.  Medicare only paid for over-the-counter COVID tests during this demonstration, which ended after May 11, 2023.  Analysis of Medicare Parts B and C data revealed that since December 2021, FAST LAB had <u>never</u> billed CPT code K1034.

## C.        MEDICARE

28.     The Medicare Program ("Medicare") is a federal health care program for the aged and disabled established by Congress in 1965, as Title XVIII of the

Social Security Act and codified at 42 U.S.C. § 1395.  Medicare is administered

through CMS, a division of the United States Department of Health and Human

Services.  Individuals who received benefits under Medicare are referred to as

Medicare "beneficiaries."

29.     Medicare is a "health care benefit program" as defined by Title 18,

United States Code, Section 24(b).

30.     Medicare includes coverage under four primary components: hospital

insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and

prescription drug benefits (Part D).  Medicare Part B covers the cost of physicians'

services and other ancillary services (including testing) not covered by Part A.

31.     Medicare Part D provides prescription drug coverage to persons who

are eligible for Medicare.  Under the program, eligible Medicare beneficiaries are

able to enroll in a Medicare Prescription Drug Plan that adds prescription drug

coverage to traditional Medicare.  Alternatively, Medicare eligible beneficiaries are

able to obtain prescription drug coverage by enrolling in a Medicare Advantage Plan

under Part C of the Medicare program.  Such Medicare Advantage Plans provide the

full range of Medicare coverage to enrollees, including coverage for testing.

32.     Wisconsin Physicians Service is the CMS contracted carrier for

Medicare Part B in the state of Michigan.  Cahaba Safeguard Administrators, LLC

("Cahaba") is the Program Safeguard Contractor for Medicare Part B in the state of

Michigan.

33.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement.  In order to receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

34.    Health care providers who seek to bill Medicare are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.  Providers are advised that they can only submit claims to Medicare for medically necessary services they rendered, and providers are required to maintain patient records to verify that the services are provided as described on the claim.

**D.        MEDICAID**

35.    The Medicaid Program ("Medicaid") is a Federal/State program which has as its purpose the provision of medical services to those persons who could not otherwise afford them.

36.    Pursuant to Title XIX of the Social Security Act (42 USC 1396, et seq.) and the Michigan Social Welfare Act (400.1, et seq.; MSA 16.614(11), as amended,

the Michigan Department of Community Health (hereinafter referred to as DCH)

administer the Michigan Medical Assistance Program (hereinafter referred to as

Medicaid).

37.     Medicaid is a "health care benefit program" as defined by Title 18,

United States Code, Section 24(b).

38.     Health care providers who seek to bill Medicaid are informed of the

rules and responsibilities through provider manuals that are provided to them by

DCH at the time of enrollment and periodically receive correspondence when

policy/procedural changes occur.  Providers are advised that they could only submit

claims to Medicaid for medically necessary services they rendered, and providers

are required to maintain patient records to verify that the services are provided as

described on the claim.

**E.        OFFICE OF PERSONNEL MANAGEMENT –**

**FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM (FEHBP)**

39.     The Federal Employees Health Benefits Program (FEHBP or the

Program) is a federally funded insurance program established by Congress in 1959,

pursuant to the Federal Employees Health Benefits Act.  5 U.S.C. § 8901 et seq.

The Program is for federal employees, retirees, and their spouses and unmarried

children under the age of 26.  5 C.F.R § 890.30222.  OPM administers the Program

and contracts with various health insurance carriers ("Carriers") to provide services

24

to FEHBP members.  5 U.S.C. §§ 8902, 8909(a).

40.    Monies for the FEHBP are maintained by the United States Treasury in the Employees Health Benefits Fund ("the Fund"), which OPM administers.  5 U.S.C. § 8909(a).  The Fund—which the United States Treasury holds and invests— is the source of all relevant payments to the Carriers for services rendered to FEHBP members.  5 U.S.C. § 8909.

41.    Federal agencies and their employees contribute to the Fund through health insurance premiums, referred to as contributions.  5 U.S.C. § 8906.  Federal employees' portions of the contribution are withheld from each paycheck, then forwarded to the Fund by the employing agency, along with the agency's share of the premium.  5 U.S.C. § 8906(d), (e).  The Treasury holds and invests the Treasury Fund balances.  5 U.S.C. § 8909.  Proceeds from the Fund are used to pay Carriers for covered claims paid on behalf of FEHBP members.

42.    Carriers do not have any right to monies from the Treasury for reimbursement of benefits unless and until they incur legitimate costs for actual covered services rendered to the members and submit claims to the Government for the payment for those services.  FEHBP benefits are payable only for services necessary to prevent, diagnose, or treat an illness, disease, injury, or condition.

25

**F.        THE U.S. DEPARTMENT OF LABOR – OFFICE OF INSPECTOR GENERAL AND EMPLOYEE BENEFITS SECURITY ADMINISTRATION**

43.     DOL-EBSA is responsible for administering and enforcing Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), which establishes fiduciary standards governing the operation of employer-sponsored employee benefit plans, including health plans. EBSA conducts civil investigations to ensure compliance with ERISA and protect plan assets from mismanagement, fraud, and abuse. In cases where potential criminal violations are identified, EBSA collaborates with the U.S. Department of Labor, Office of Inspector General (DOL-OIG) and other federal law enforcement agencies to conduct criminal investigations.

44.     DOL-OIG conducts criminal investigations across all DOL programs, including those involving employee benefit plans. DOL-OIG investigates fraud, waste, and abuse affecting benefit programs, and pursues criminal enforcement in cases involving embezzlement, kickbacks, false statements, and other offenses. DOL-OIG works closely with EBSA when evidence indicates potential criminal conduct within ERISA-covered plans.

45.     Title 18 U.S.C. Section 24(b), Definitions Relating to Federal Health Care Offenses, provides that ERISA covered private group plans are health care benefit programs or contracts affecting commerce, under which any medical benefit,

26

item, or service is provided to any individual, and includes any individual or entity

who is providing a medical benefit, item, or service for which payment may be

issued.  Therefore, private insurance companies, third-party administrators, and self-

funded healthcare plans administered by an employer may also be considered health

care benefit programs under federal law.

46.    In a fully insured group health plan, the employer obtains an insurance

policy or contract from an insurance carrier qualified to transact insurance in a state.

The employer pays the premiums directly to the insurance carrier out of its general

assets, or out of a combination of its general assets and employee contributions

which are deducted from payroll.  The insurance carrier processes claim and pays

providers.  The insurance carrier assumes the risk in this arrangement.

47.    In a self-funded group health plan, the employer pays for covered

employees' health benefits out of its general assets or from a trust account

established to fund the plan.  Because the employer self-funds rather than obtaining

an insurance policy, the employer assumes the financial risk for paying benefits

under the plan.

48.    The employer sponsor of a self-funded plan may administer the health

plan itself or may choose to retain an outside entity to administer the plan, known as

a third-party administrator (TPA), administrative services organization (ASO), or a

broker.  Administration of the plan typically involves paying claims, resolving

disputes, negotiating payment rates, and performing other administrative the duties.

49.     Third-Party Administrators (TPAs) handle funds that are considered

plan assets to the extent that they either come from a plan's trust fund; are placed in

an account in the name of the plan; include participant contributions; or are

otherwise identified as property of the plan under common law property rights.

ERISA covered health care plans, and their service providers may only pay claims

or provide reimbursement of benefits for legitimate medical benefit items or services

to plan participants that are allowable under the private plan or contract.

## G. DEPARTMENT OF DEFENSE OFFICE OF THE INSPECTOR

## GENERAL, DEFENSE CRIMINAL INVESTIGATIVE SERVICE - TRICARE

50.     TRICARE is a multiple option benefit plan established by Congress and

funded through federal appropriations and allocated as part of the National Defense

Authorizations Act.  Eligible beneficiaries include all eight branches of the

Uniformed Services: Army, Air Force, Navy, Marine Corps, Space Force, National

Oceanic Atmospheric Administration, Coast Guard, and the commissioned corps of

the Public Health Service.  TRICARE benefits are authorized by congressional

legislation incorporated in Chapter 55 of Title 10, United States Code, and

implemented by the Secretary of Defense and the Secretary of Health and Human

Services in 32, Code of Federal Regulations, Part 199 (32 CFR 199).

51.     According to 32 CFR, Part 199.4(1)(i), Basic Program Benefits, and

subject to all applicable definitions, conditions, limitations, or exclusions specified

in the regulation, TRICARE will only pay for medically necessary services and

supplies required in the diagnosis and treatment of illness or injury and provided by

authorized providers.

52.     TRICARE regulation 32 CFR 199.9, Administrative Remedies for

Fraud, Abuse, and Conflict of Interest, lists examples of situations presumed to be

fraudulent and/or abusive against the TRICARE program.  Abuse and fraud

situations under TRICARE are a sufficient basis for denying all or any part of

TRICARE cost-sharing of individual claims.

53.     To receive reimbursement for services rendered to health care benefit

program beneficiaries, TRICARE requires providers to submit claim forms with the

identifying provider number, the patient name, the diagnosis(s), the treatment(s) or

services(s) rendered, the date of the treatment(s) and/or service(s).  Upon receipt of

the provider's bill, TRICARE, using Fiscal Intermediaries (FIs), determines whether

the claim is covered and the amount of reimbursement that will be allowed.  After

calculating the allowable rate, TRICARE pays the provider a portion of the

allowable rate for services rendered.  The participating provider then attempts to

collect from the beneficiary the remaining portion of the allowable amount, which is

the cost share or co-payment.

*The Fraudulent Scheme*

29

**Overview of Investigation**

54.    During this investigation, the investigative team relied on the
information of multiple agencies.  The investigation began in or around May 2023,
when HHS-OIG and Blue Cross Blue Shield of Michigan ("BCBSM") identified a
scheme to defraud Medicare, Medicaid and BCBSM (health benefit programs) by
submitting fraudulent claims for COVID PCR laboratory testing of saliva samples,
which were never conducted.  The investigation revealed that beneficiaries requested
what they believed to be "rapid" antigen test kits from FAST LAB online.  FAST
LAB advertised the tests as being free at home test kits.  However, FAST LAB
required the beneficiaries to enter their health insurance information in order to
receive the kits.  FAST LAB then provided the beneficiaries with both "rapid"
antigen tests and "laboratory" PCR test kits which required the collection of a saliva
sample under the supervision of a health care professional.  FAST LAB instructed
beneficiaries to collect their own saliva sample and mail the sample back for
laboratory testing, despite the fact that insurance providers required these samples to
be collected under the supervision of a health care professional in order for the PCR
tests to be eligible for payment.

55.    Throughout the course of the investigation, it was determined PCR
saliva samples were generally not returned by the beneficiaries to FAST LAB for
testing.  However, BIRICIK, through FAST LAB, submitted or caused the

submission of false and fraudulent claims to the health care benefit programs as though FAST LAB had performed the PCR test in a laboratory. These claims were often submitted *before* the test kits even arrived at the beneficiaries' residences. In addition, once a beneficiary's insurance had been successfully billed for the performance of a PCR test, BIRICIK, through FAST LAB, would thereafter repeatedly submit or cause the submission of false and fraudulent claims to the beneficiary's health care benefit program at regular intervals for the performance of additional PCR tests, without the beneficiary's knowledge or consent. These additional billings were initiated even though no additional tests were requested by the beneficiary. Thus, health care benefit programs were billed for services that were never rendered.

56.     Throughout the course of the investigation, it was determined that BIRICIK, through FAST LAB, submitted or caused to be submitted false and fraudulent claims for beneficiaries who resided in all 50 states.

57.     On May 24, 2023, the FBI received an anonymous tip via their online complaint system. The tipster alleged BIRICIK used FAST LAB to commit medical billing fraud by billing for PCR tests that were never performed. The tipster alleged that BIRICIK "billed [the] full amount for laboratory fees when the PCR test was never actually received." The tipster further alleged that BIRICIK billed the beneficiaries for additional laboratory services without their knowledge, created a

31

subscription to bill customers without their knowledge, and threatened to bill beneficiaries directly.

58.    On October 4, 2024, using information obtained from Charter Communications, investigating agents determined the IP address associated with the complaint belonged to a former employee who left the company on May 23, 2023.

59.    On September 12, 2024, HHS-OIG received another anonymous tip via their telephone complaint system, 1-800-HHS-TIPS (1-800-447-8477). The tipster alleged that BIRICIK was engaged in Medicare and Medicaid fraud and had been since 2021.  The tipster alleged that BIRICIK owned FAST LAB and another company "Fast Doc."  The tipster stated BIRICIK was billing for two antigen and eight PCR tests without performing the tests.  The tipster further alleged that BIRICIK was working with one of the company directors to alter patient documents to cover up the fraud.

**Undercover Operations**

60.    On August 6, 2024, investigating agents from HHS-OIG, acting in an undercover capacity, visited fastlabtech.com from the Eastern District of Michigan (EDMI).  Investigating agents posed as a Medicare beneficiary and conducted an online undercover operation utilizing an undercover Medicare card.

61.    Investigating agents, posing as this undercover Medicare beneficiary (UC-1), accessed the fastlabtech.com website and clicked the icon for the no cost

32

COVID test.  After entering the name, address, date of birth, sex, ethnicity and race, undercover email address, undercover cell phone number, and undercover Medicare card number, the website asked what symptoms UC-1 was experiencing. Investigating agents, posing as UC-1, selected the following symptoms: fever, cough, fatigue, muscle or body aches, headache, loss of taste/smell, sore throat, and congestion or runny nose.  Investigating agents, posing as UC-1, also acknowledged the consent statement and the assignment of benefits and appointment of representative statement online.  Investigating agents, posing as UC-1, also checked the acknowledgement that stated the following: "By checking this box I acknowledge that the insurance details I have provided are correct and I can be billed the full amount for the test kit if my insurance details are found to be invalid."

62.     Below this, the number of antigen tests box was prepopulated with "8" and investigating agents, posing as UC-1, were asked if they needed a PCR test. Investigating agents, posing as UC-1, checked this box affirmatively and the number of PCR test boxes was prepopulated with "2".  Once this information was entered, investigating agents, posing as UC-1, clicked the icon affirmatively to finalize the order and a chat box immediately appeared that was prepopulated with the symptoms selected previously for UC-1.  The website generated a pop-up chat box with the sender labelled as FAST LAB representative JULIE LADD ("LADD"). LADD asked when UC-1's symptoms first started, and investigating agents, posing

33

as UC-1, responded with "late last night and into today."  LADD immediately

responded with the following, "Your order has been approved and finalized.  Thank

you!  I hope you start feeling better soon."  This chat conversation was encapsulated

in an email that was sent to UC-1's undercover email address from "Julie -

https://fastlabtech.com/julie@fastlabtech.on.crisp.email" on August 6, 2024 at

approximately 12:57pm.

      63.     A government-controlled Post Office box received UC-1's test kits from

FAST LAB on August 14, 16, 20, 23, and 26, 2025.  On September 11, 2024, an

investigating agent from the USPIS provided investigating agents from HHS-OIG,

who previously posed as UC-1, the test kits from FAST LAB, received at the

undercover address linked to UC-1.  HHS-OIG investigating agents received the

following kits: six antigen test kits loaded within three separate shipping envelopes,

and two boxes each loaded with one PCR test kit and one antigen test kit.  HHS-OIG

investigating agents, posing as UC-1, never submitted a saliva sample to FAST LAB

for testing.

      64.     On October 15, 2024, investigating agents obtained Medicare Part B

claims data billed to UC-1's undercover Medicare card.  From August 9, 2024 to

September 1, 2024, FAST LAB billed Medicare Part B for eight claims of procedure

code 87811 (Detection test by immunoassay with direct visual observation for

Severe Acute Respiratory Syndrome Coronavirus 2 (COVID)).  FAST LAB billed

Medicare Part B $2,600 and Medicare Part B paid FAST LAB $324.40.  See below:

| DOS | CPT Code | Diag | Billed Amount | Paid Amount | Referring Provider NPI | Referring Provider |
|---|---|---|---|---|---|---|
| 8/9/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/13/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/15/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/19/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/21/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/25/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 8/27/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| 9/1/2024 | 87811 | Z20822 | $325.00 | $40.55 | 1326062597 | MARTIN PERLIN |
| | | Totals: | $2,600.00 | $324.40 | | |

65.     Investigating agents also noted that the initial claim was submitted with a service date of August 9, 2024, prior to investigating agents' receipt of the COVID PCR test.

66.     On three other occasions, September 3, 23 and 26, 2024, investigating agents from HHS-OIG conducted separate online undercover operations seeking no-cost COVID test kits from fastlabtech.com, in the same way they did posing as UC-

1.  After each operation, investigating agents received PCR and antigen test kits loaded within two separate shipping envelopes.  Investigating agents never submitted a saliva sample to FAST LAB for testing.  Investigating agents also noted that the initial claims to the health benefit programs were submitted with a service date prior to investigating agents' receipt of the COVID PCR test.  In the third online undercover operation, investigating agents never received the test kits because the test kits were returned to sender by USPS.  In this instance, the undercover Medicare card, utilized by investigating agents, was billed as if laboratory analysis had been conducted.  Investigating agents never had follow-up communications with FAST LAB for FAST LAB personnel to either witness or review the test or test results.FAST LAB billed Medicare Part B respectively $2,600, $1,950, and $2,600; and Medicare Part B paid FAST LAB respectively $324.40, $243.40, and $324.40 for the second, third and fourth undercover operations conducted by investigating agents.

**Medicare Beneficiary Complaints**

67.    Medicare beneficiaries can report complaints to HHS-OIG through a telephonic complaint hotline, 1-800-HHS-TIPS (1-800-447-8477) and online complaint portal, http://www.tips.oig.hhs.gov.  The hotline receives calls from the public regarding any Medicare-related issue, including fraud, waste, abuse, or quality of care issues.  Beginning on February 14, 2023, and continuing until May

36

31, 2025, the HHS-OIG received approximately 130 beneficiary complaints listing FAST LAB as the subject of the complaint, and many of the beneficiaries reported that Medicare was billed by FAST LAB for the testing of samples that the beneficiaries never sent back to FAST LAB for testing. Similarly, to date, there have been more than 1,000 Benefit Integrity Unit complaints called into 1-800-MEDICARE.

**Beneficiary Interviews**

68.     Investigating agents interviewed Medicare and BCBS beneficiaries to corroborate the information received from BCBSM and complaints submitted to the HHS-OIG Hotline.  HHS-OIG agents and BCBSM interviewed more than a dozen Medicare and BCBS beneficiaries—including, but not limited to, five Medicare beneficiaries and two BCBS beneficiaries discussed in greater detail below—for whom BIRICIK, through FAST LAB, submitted claims to their health care benefit programs for the processing of submitted saliva samples for COVID testing at FAST LAB.  All but one of the interviewed beneficiaries denied sending any saliva samples for PCR COVID testing to FAST LAB; one beneficiary believed they sent one sample back.

69.     Investigating agents interviewed Medicare Beneficiary 1 ("MB-1"), residing in Oxford, Michigan, regarding 18 Medicare claims submitted by FAST LAB between December 20, 2022, and January 5, 2023.  MB-1 indicated s/he was

37

online looking for a free at-home COVID test when an advertisement popped up on Facebook for free at-home COVID tests. MB-1 reiterated s/he was not looking for a COVID test that required MB-1 to send a sample to a lab. MB-1 confirmed receiving a package from FAST LAB in January 2023 and that MB-1 never sent a sample back to FAST LAB. MB-1 had the original package s/he received, which contained the test kit from FAST LAB, and provided that package to the interviewing agent. MB-1 further stated that s/he has never seen Dr. Martin Perlin[1] for medical services and had never been to the State of New York to see a doctor.

70. Investigating agents reviewed the Medicare Part C billing data for MB-1 from December 20, 2022, to January 5, 2023, and determined that BIRICIK, through FAST LAB, submitted or caused the submission of $2,850.00 in fraudulent claims to Medicare for performing laboratory analysis of MB-1's COVID PCR tests and was paid $725.94 for services that were never rendered. Investigating agents also noted that the initial claim was submitted with a service date of December 20, 2022, prior to MB-1's receipt of the COVID PCR test in January 2023.

71. Investigating agents interviewed Medicare Beneficiary 2 ("MB-2"),

---

[1] Dr. Perlin is listed as the only "referring physician" on claims submitted to Medicare Part B by FAST LAB for COVID testing. Dr. Perlin is the top "referring physician" on claims submitted to Medicare Part C by FAST LAB for COVID testing, accounting for 91% of the Medicare Part C beneficiaries.

residing in Millington, Michigan, regarding 12 Medicare claims submitted by FAST

LAB between December 29, 2022, and January 6, 2023.  MB-2 indicated s/he was

online looking for free at-home COVID tests and noted s/he was not looking for test

kits that would require MB-2 to send a sample to a lab.  MB-2 recalled providing

MB-2's Medicare information online to FAST LAB.  MB-2 indicated s/he received

one box from FAST LAB and that s/he would not have requested the kits if MB-2

knew it would require mailing a sample back to the lab.  MB-2 indicated s/he

expected to receive a three or five pack of at-home COVID tests, not the box MB-2

received from FAST LAB.  MB-2 confirmed s/he never sent a saliva sample to

FAST LAB.  MB-2 provided the interviewing agents with the original box s/he

received from FAST LAB.  MB-2 also indicated s/he has never heard of Dr. Martin

Perlin.

72.     Investigating agents reviewed the Medicare Part C billing data for MB-

2 from December 29, 2022, to January 6, 2023, and determined that BIRICIK,

through FAST LAB, submitted or caused the submission of $1,900.00 in fraudulent

claims to Medicare for performing laboratory analysis of MB-2's COVID PCR tests

and was paid $493.84 for services that were never rendered.

73.     Investigating agents interviewed Medicare Beneficiary 3 ("MB-3")

residing in Clio, Michigan, regarding 12 Medicare claims submitted by FAST LAB

between February 1, 2023, and March 8, 2023.  MB-3 indicated s/he was online

searching for Medicare-provided free COVID tests.  MB-3 entered her Medicare information online and received two boxes in the mail from FAST LAB.  MB-3 was surprised when s/he opened the boxes because they did not appear to be the at-home antigen tests that MB-3 was looking for.  MB-3 considered sending the unused tests back to FAST LAB but instead just set the tests aside.  MB-3 confirmed the shipping date on the first package MB-3 received was February 5, 2023, and the second package arrived after that date.  MB-3 indicated s/he never returned any saliva samples to FAST LAB for testing and thought the company was "shady" when s/he saw the instructions said to send a sample back to FAST LAB.  MB-3 also indicated s/he has never heard of Dr. Martin Perlin.

74.     Investigating agents reviewed the Medicare Part C billing data for MB-3 from February 1, 2023, to March 8, 2023 and determined that BIRICIK, through FAST LAB, submitted or caused the submission of $3,150.00 in fraudulent claims to Medicare for performing laboratory analysis of MB-3's COVID PCR tests and was paid $140.58 for services that were never rendered.  Investigating agents also noted that the initial claim was submitted for a service date of February 1, 2025, prior to MB-3's receipt of the COVID PCR test.

75.     Medicare Beneficiary 4 ("MB-4"), residing in Flint, Michigan, was interviewed regarding 29 Medicare claims submitted by FAST LAB between April 15, 2023 and May 2, 2023.  MB-4 indicated s/he was online looking for free at-

home COVID tests.  MB-4 received three or four packages from FAST LAB and s/he did not return any saliva samples for testing at FAST LAB.  MB-4 further noted s/he never heard of Dr. Martin Perlin.

76.    Investigating agents reviewed the Medicare Part C billing data for MB-4 from April 15, 2023, to May 2, 2023 and determined that BIRICIK, through FAST LAB, submitted or caused the submission of $4,750.00 in fraudulent claims to Medicare for performing laboratory analysis of MB-4's COVID PCR tests and was paid $1,088.91 for services that were never rendered.

77.    Medicare Beneficiary 5 ("MB-5"), residing in Flint, Michigan, was interviewed regarding 13 Medicare claims submitted by FAST LAB between January 10, 2023, and January 25, 2023.  MB-5 indicated s/he looked up free at-home COVID tests via Google and confirmed that s/he received packages from FAST LAB.  MB-5 indicated s/he never returned any saliva samples for testing at FAST LAB and had never heard of physician, Dr. Martin Perlin.  MB-5 provided the interviewing agents the packages from FAST LAB that still contained the COVID PCR test.

78.    Blue Cross Blue Shield 1 ("BCBS-1"), residing in Clio, Michigan, was interviewed regarding 30 BCBS claims submitted by FAST LAB between February 26, 2023, and April 14, 2023.  BCBS-1 indicated s/he was on Facebook when an ad popped up from FAST LAB for free at-home COVID tests.  BCBS-1 recalled

entering their BCBS information to receive the free tests.  BCBS-1 received multiple

tests over the course of a month.  In reviewing one of the packages, BCBS-1 noticed

a vial and return label.  The other packages had loose tests on the inside and BCBS-1

thought that was odd.  BCBS-1 did not return any saliva samples to FAST LAB for

testing.  BCBS-1 further noted s/he never heard of Dr. Martin Perlin.

79.     Investigating agents reviewed the BCBS billing data for BCBS-1 from

February 26, 2023, to April 14, 2023 and determined that BIRICIK, through FAST

LAB, submitted or caused the submission of $4,750.00 in fraudulent claims to

Medicare for performing laboratory analysis of BCBS-1's COVID PCR tests and

was paid $2,500.00 for services that were never rendered.

80.     Blue Cross Blue Shield 2 ("BCBS-2"), residing in Clarkston, Michigan,

was interviewed regarding 30 BCBS claims submitted by FAST LAB between

March 22, 2023, and April 13, 2023.  BCBS-2 indicated s/he was online looking for

free at-home COVID tests, not the tests that required a sample to be submitted.

BCBS-2 received several packages from FAST LAB.  BCBS-2 never sent a saliva

sample to FAST LAB and, in fact, BCBS-2 provided the interviewing agents with

the original package which contained the test kit BCBS-2 received from FAST LAB.

BCBS-2 also indicated s/he has never heard of Dr. Martin Perlin.

81.     Investigating agents reviewed the BCBS billing data for BCBS-2 from

March 22, 2023, to April 13, 2023 and determined that BIRICIK, through FAST

LAB, submitted or caused the submission of $4,750.00 in fraudulent claims to Medicare for performing laboratory analysis of BCBS-2's COVID PCR tests and was paid $2,250.00 for services that were never rendered.

**BILLING RECORDS**

*Medicare Data*

82.     An analysis of the Medicare billing records of FAST LAB indicates that since December 2021, BIRICIK, through FAST LAB, has submitted or caused the submission of approximately $180 million in Medicare Part B for COVID laboratory testing codes and has been paid approximately $16 million on those Part B claims.  BIRICIK, through FAST LAB, has also submitted or caused the submission of approximately $228 million in Medicare Part C for COVID laboratory testing codes and has been paid approximately $20 million on those Part C claims.

83.     An analysis of the billing records of FAST LAB revealed a high number of claims filed for the same beneficiary repeatedly in a very short span of time.  On several occasions, Medicare was billed approximately ten times within a span of 30 days.  These claims either represented that the beneficiary submitted a saliva sample to FAST LAB for laboratory testing or that a FAST LAB representative witnessed—either in person or via video conferencing—the beneficiary perform their antigen test, while logging the test results.

84.     Based on the interviews conducted of Medicare and private health

43

benefit programs beneficiaries, as well as the undercover operations, investigating agents learned that the saliva samples were not returned to FAST LAB for laboratory testing nor did an in-person or video conferencing consultation with a FAST LAB representative occur.  Regardless, BIRICIK through FAST LAB, repeatedly submitted or caused the submission of false and fraudulent claims, within a short span of time, for services that were not performed.  Based on my training and experience with healthcare fraud investigations, the repeated billing for items or services in a short period of time is an indicator that the subject entity is engaged in fraudulent billing for items or services that are not actually provided.

*Medicaid Data*

85.     An analysis of the Medicaid billing records of FAST LAB indicates that since September 14, 2021, BIRICIK, through FAST LAB, has submitted or caused the submission of approximately $56 million in Medicaid claims for COVID laboratory testing codes and has been paid approximately $5.8 million on those claims.

86.     An analysis of the billing records of FAST LAB revealed a high number of claims filed for the same beneficiary repeatedly in a very short span of time.  On several occasions, Medicaid was billed approximately ten times within the span of 30 days, with each claim making the representation that the beneficiary submitted a saliva sample for COVID testing to a laboratory each time.

*OPM Data*

87.     An analysis of the OPM billing records of FAST LAB indicates that

since September 14, 2021, BIRICIK, through FAST LAB, has submitted or caused

the submission of approximately $2.1 million in OPM health benefit plans for

COVID laboratory testing codes and has been paid approximately $1.2 million on

those claims.

88.     An analysis of the billing records of FAST LAB revealed a high

number of claims filed for the same beneficiary repeatedly in a very short span of

time.  On several occasions, federally funded health plans were billed approximately

six times within the short span of 30 days, with each claim making the

representation that the beneficiary submitted a saliva sample for COVID testing to a

laboratory each time.

*DOL Data*

89.     An analysis of the DOL billing records of FAST LAB indicates that

since December 16, 2021, BIRICIK, through FAST LAB, has submitted or caused

the submission of approximately $101 million in DOL health benefit plans for

COVID laboratory testing codes and has been paid approximately $8.1 million on

those claims.

90.     An analysis of the billing records of FAST LAB revealed a high

number of claims filed for the same beneficiary repeatedly in a very short span of

time.  In several instances, private health plans were billed approximately 6 times within the short span of 30 days, with each claim making the representation that the beneficiary submitted a saliva sample for COVID testing to a laboratory each time.

*TRICARE Data*

91.     An analysis of the TRICARE billing records of FAST LAB indicates that since December 30, 2021, BIRICIK, through FAST LAB, has submitted or caused the submission of approximately $8.2 million in TRICARE health benefit plans for COVID laboratory testing codes and has been paid approximately $1.6 million on those claims.

92.     An analysis of the billing records of FAST LAB revealed a high number of claims filed for the same beneficiary repeatedly in a very short span of time.  On several occasions, TRICARE health plans were billed approximately ten times within the short span of 30 days, with each claim making the representation that the beneficiary submitted a saliva sample for COVID testing to a laboratory each time.

93.     In total, from September 14, 2021 to July 17, 2025, BIRICIK, through FAST LAB, has submitted or caused the submission of approximately $500 million to Medicare, Medicaid, TRICARE, and/or private insurance companies such as Blue Cross Blue Shield.  Based on my training and experience with healthcare fraud, the repeated billing for items or services in a short period of time and across numerous

46

government and private health insurance carriers, is an indicator that a subject entity

is engaged in fraudulent billing for items or services that are not actually provided.

## THE FINANCIAL INVESTIGATION

### *Overview of the Financial Investigation*

94.     Investigating agents obtained and reviewed financial records

throughout the course of this investigation.  From 2021 through 2024, records show

that the main bank account FAST LAB used as a repository account for the receipt

of payments from Medicare, Medicaid, and other private insurance companies was

account ending 772378615 at JPMorgan Chase ("FAST LAB x8615").  The account

was opened on September 28, 2021, and BIRICIK, Hasan Seyhun, and Taylor

Donovan were signers on the account.  A review of the records revealed that

BIRICIK has received more than $39 million deposited into this account from

claims paid by Medicare, Medicaid, TRICARE and private health care benefit

programs.

95.     JPMorgan Chase Bank Account 828163722 held in the name of Fast

Lab Technologies LLC (FAST LAB x3722) was opened on March 22, 2022.  The

authorized signers listed on the account were BIRICIK and Dr. Martin Perlin.

Records show that FAST LAB x3722 is a repository account for the receipt of

payments for services from Medicare, Medicaid, TRICARE and private insurance

companies.  Records were received and analyzed for the time frame of March 2022

47

through October 2024, and revealed Medicare, Medicaid, TRICARE and private insurance companies reimbursed FAST LAB approximately $681,515.21 from FAST LAB x3722.

96.     Financial tracing completed by members of the investigative team showed that BIRICIK, and others involved in the scheme, used the funds fraudulently obtained via FAST LAB bank accounts to fund personal expenses and large purchases (e.g., high-end goods, etc. to include BIRICIK's Florida residence, as well as an SR22T Cirrus Aircraft.  The Federal Aviation Administration (FAA) registration of the purchased SR22T Cirrus Aircraft is associated with BIRICIK.



Screenshots from Isabel Biricik's TikTok video, dated January 30, 2025.

97.     Additional financial tracing showed that funds fraudulently obtained via

48

FAST LAB were also used to purchase vehicles (e.g., a 2023 Lamborghini Urus, a 2023 Rivian R1T, a 2023 Bentley Bentayga, a 2023 Audi Q3, a 2024 BMW M4, a 2022 Ford Bronco Raptor, and a 2022 Ford Bronco Sport). According to Florida Motor Vehicle Registration records, at least five vehicles were registered to FAST LAB at BIRICIK's former residence and/or BIRICIK at BIRICIK's Florida residence, including the 2023 Lamborghini Urus (Vehicle Identification Number (VIN): ZPBUC3ZLXPLA25853), 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960), 2022 Ford Bronco Raptor (VIN: 1FMEE5JR1NLA50344), 2022 Ford Bronco Sport (VIN: 3FMCR9C69NRE24285), and 2023 Bentley Bentayga (VIN: SJAAR2ZVXPC023963). A 2023 Audi Q3 (VIN: WA1EECF36P1144452) was registered to BIRICIK's daughter, Isabella Biricik. Additionally, a 2024 BMW M4[2] (VIN: WBS33BA02RCP10794) was registered to BIRICIK's wife, Isabel Biricik, at BIRICIK's Florida residence. Financial analysis revealed each aforementioned vehicle was purchased in cash with funds from health care fraud proceeds deposited into FAST LAB's main bank accounts. Based on my training and experience, those engaged in health care fraud often use fraud proceeds to purchase high-end items and motor vehicles.

---

[2] A search of social media revealed that Isabel Biricik treated the car with a cosmetic wrap that changed the color of the exterior of the car from black to white.

98.     In September and October of 2024, BIRICIK pooled together funds from the health care fraud proceeds deposited into FAST LAB main bank accounts to purchase.  A review of the purchase agreement for BIRICIK's Florida residence showed the borrowers, BIRICIK and his wife, were due to pay $4,730,014.36. BIRICIK and his wife were the only two listed as the buyers of the BIRICIK's Florida residence.

99.     Based on my training and experience, persons who engage in large scale and successful health care fraud often transfer fraudulently obtained funds into personal accounts to buy cars, residences, and luxury items.

### *Flow of Funds*

100.    From March 2022 through November 2024, over $47 million of health care claim payments were credited to FAST LAB bank account 772378615 (FAST LAB x8615) at JPMorgan Chase Bank. FAST LAB x8615 was opened on September 28, 2021, and BIRICIK and Hasan Seyhun were listed as the authorized signers; subsequently, Taylor Donovan was added as an additional signer.  The bank statements for the account were mailed to 1178 Broadway Suite 401, New York, NY 10001.  Records show that FAST LAB x8615 is a repository account for the receipt of payments for services from Medicare, Medicaid, TRICARE, and private insurance companies.

101.    From August 2022 through April 2024, over $11 million from FAST

LAB x8615 was transferred to American Express for payments toward credit cards

in BIRICIK's name, as well as cards in the name of his wife, Isabel Biricik,

daughter, Isabella Biricik, and son, Sebastian Biricik.  The address associated with

the American Express statements is BIRICIK's Florida residence.

102.   On December 26, 2023, a cashier's check was purchased drawn on

funds from FAST LAB x8615 in the amount of $103,294.77 made payable to Rivian

Automotive for the purchase of a 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960)

bearing Florida license plate BI67GL.  The 2023 Rivian was registered to BIRICIK

and FAST LAB at BIRICIK's Florida residence.  Several times, surveilling agents

observed BIRICIK departing from and returning to the BIRICIK's Florida residence

in the 2023 Rivian with FL plates of BI67GL. On June 26, 2025, a review of Florida

vehicle registration information found that Florida license plate BI67GL was

associated with a 2023 Rivian with matching VIN to the 2023 Rivian purchased by

BIRICIK and registered to BIRICIK's Florida residence.

103.   On December 30, 2023, a cashier's check was purchased and drawn on

funds from FAST LAB x8615 in the amount of $373,365.25 made payable to

Braman Motorcars for the purchase of a 2023 Bentley (VIN:

SJAAR2ZVXPC023963).  BIRICIK was the sole signer on the purchase agreement.

The vehicle with the same VIN was registered to FAST LAB at BIRICIK's previous

residential address at 17662 Circle Pond Ct., Boca Raton, FL 33496.

51

104.   On January 30, 2023, a purchase was made from FAST LAB x8615 in the amount of $110,385.11 made payable to Grieco Ford of Delray Beach for the purchase of a 2022 Ford Bronco Raptor.  The vehicle is registered to FAST LAB and BIRICIK at BIRICIK's Florida residence.

105.   On January 30, 2023, a purchase was made from FAST LAB x8615 in the amount of $41,014.01 made payable to Grieco Ford of Delray Beach for the purchase of a 2022 Ford Bronco Sport.  The vehicle is registered to FAST LAB and BIRICIK at BIRICIK's Florida residence.

106.   JPMorgan Chase Bank Account 828163722 held in the name of Fast Lab Technologies LLC (FAST LAB x3722) was opened on March 22, 2022.  The authorized signers listed on the account were BIRICIK and Dr. Martin Perlin. Records show that FAST LAB x3722 is a repository account for the receipt of payments for services from Medicare, Medicaid, TRICARE, and private insurance companies.  Records were received and analyzed for the time frame of March 2022 through October 2024, and revealed Medicare, Medicaid, TRICARE, and private insurance companies reimbursed FAST LAB approximately $681,515.21 from FAST LAB x3722.

107.   From April 2023, through April 2024, over $20.5 million was transferred from FAST LAB x8615 to FAST LAB account 938555031 (FAST LAB x5031) at JPMorgan Chase Bank.  BIRICIK opened FAST LAB x5031 on March

30, 2023, and he was the sole authorized signer.  Investigation and analysis

determined, since the FAST LAB x5031 was opened, it has been nearly fully funded

by FAST LAB x8615.

108.   On December 29, 2023, BIRICIK purchased a cashier's check drawn

on funds from FAST LAB x5031 in the amount of $358,928 made payable to

Lamborghini Palm Back for the purchase of a 2023 Lamborghini Urus.  BIRICIK

used his American Express credit card to provide a down payment of $30,688.77.

The vehicle was registered to BIRICIK and FAST LAB at BIRICIK's Florida

residence.  On multiple occasions, agents observed a 2023 Lamborghini Urus at

BIRICIK's Florida residence.

109.   From 2022 through 2023, over $2 million was transferred, directly and

indirectly, from FAST LAB x8615 and FAST LAB x3722 to JPMorgan Chase Bank

Account 672082663, Mavric Marketing Associates LLC (Mavric x2663). Mavric

x2663 was opened on December 11, 2020, and the signer listed on the account was

BIRICIK.  Investigation and analysis determined, since 2022, Mavric x2663 has

been nearly fully funded, both directly and indirectly, by the previously identified

accounts, FAST LAB x8615 and FAST LAB x3722.  A review of x2663 bank

records identified BIRICIK as a Manager of Marvric.

110.   On July 22, 2023, BIRICIK purchased cashier's check No. 1175434310

drawn on funds from Mavric x2663 in the amount of $44,306.19 made payable to

Audi Coral Springs for the purchase of a 2023 Audi Q3 for BIRICIK's daughter, Isabella Biricik.

111.   On November 22, 2024, BIRICIK transferred $113,000 from FAST LAB x8615 to his personal account, BIRICIK x5125.  The same day, BIRICIK sent a $113,250 wire transfer to Cirrus Design Corporation.   FAA records show that a 2025 Cirrus Design Corporation SR22T (Serial Number 10395) is registered to BIRICIK at BIRICIK's Florida residence.  On or about January 30, 2025, Isabel Biricik posted a video on social media showing Isabel Biricik and BIRICIK exiting a vehicle that was driven into an aircraft hangar to accept ownership of an SR22T Cirrus aircraft.

112.   Bank records show FAST LAB x8615 transferred $317,431 to Gusto between November 15, 2021, and July 5, 2023.  Further, FAST LAB x3722 transferred approximately $11,688,627.35 to Gusto between August 17, 2022, and October 26, 2024.

113.   From April 2023 through May 2023, over $246,887.34 was transferred from Gusto to JPMorgan Chase Bank Account 939265978, Bit Byte Bit LLC (Bit Byte Bit x5978).  Bit Byte Bit x5978 was opened on April 4, 2023.  The signers listed on the account were BIRICIK and his wife, Isabel Biricik.

114.   On September 13, 2024, BIRICIK purchased a cashier's check drawn on funds from Bit Byte Bit x5978 in the amount of $110,764.91 made payable to

BMW of Delray for the purchase of a 2024 BMW M4. The vehicle was registered to BIRICIK's wife, Isabel Biricik, at BIRICIK's Florida residence.  Agents conducted surveillance and observed a white BMW in the driveway of BIRICIK's Florida residence.

115.   From April 2024 through May 2024, BIRICIK transferred over $11 million from FAST LAB x5031 to two Brokerage Accounts and approximately $325,000 to Mavric x2663.

116.   On September 26, 2024, BIRICIK transferred $3,049,000 from one of the two Brokerage Accounts to JPMorgan Chase Bank account 922685125 (BIRICIK x85125).  BIRICIK x85125 was opened on January 27, 2023, and signers listed on the account were both BIRICIK and Isabel Biricik.  Additionally, on the same day, September 26, 2024, a wire transfer in the amount of $1,951,000 from a Brokerage account owned by BIRICIK was transferred to BIRICIK x5125. Investigation and analysis determined in 2024 BIRICIK x5125 was nearly fully funded by and received over $5.5 million, both directly and indirectly, from FAST LAB x8615 and FAST LAB x3722.

117.   On September 26, 2024, a transfer in the amount of $100,000.00 was wired from BIRICIK x85125 to a third-party trust account 1000203971451 in the name of Palm Beach Regional Trust (third-party trust account x1451) at Truist Bank.  On October 2, 2024, another transfer in the amount of $150,000.00 was wired

55

to third-party trust account x1451.  Additionally, on October 10, 2024, a transfer in

the amount of $4,464,879.38 was wired from BIRICIK x85125 to account x1451.

These wire transfers funded the purchase of BIRICIK's Florida residence.

118.   Additional financial tracing found that fraudulently obtained FAST

LAB money was transferred, directly and indirectly, into accounts of different

business controlled by BIRICIK and others known and unknown, including

JPMorgan Chase Bank Account 531765660 held in the name of Fast Doc (Fast Doc

x5660). Fast Doc x5660 was opened on August 14, 2023.  The signer listed on the

account was BIRICIK.   Investigating agents received and analyzed records for the

time frame of September 2023 through October 2024, which determined in 2024

Fast Doc x5660 was nearly fully funded by and received $166,300 from the

previously identified account, FAST LAB x8615.

## *FINANCIAL TRACING*

119.   Investigating agents obtained and reviewed NUMEROUS financial

records throughout the course of this investigation.  From 2021 through 2024,

records show that the main bank account FAST LAB used as a repository account

for the receipt of payments from Medicare, Medicaid, and other private insurance

companies account ending 772378615 at JPMorgan Chase ("FAST LAB x8615").

The account was opened on September 28, 2021, and BIRICIK, Hasan Seyhun, and

Taylor Donovan were signers on the account.  A review of the records revealed that

BIRICIK has received more than $47 million deposited into repository accounts from claims paid by Medicare, Medicaid, and private health care benefit programs.

120. JPMorgan Chase Bank Account 828163722 held in the name of Fast Lab Technologies LLC (FAST LAB x3722) was opened on March 22, 2022. The authorized signers listed on the account were BIRICIK and Dr. Martin Perlin. Records show that FAST LAB x3722 is a repository account for the receipt of payments for services from Medicare, Medicaid, and other private insurance companies. Records were received and analyzed for the time frame of March 2022 through October 2024, and revealed Medicare, Medicaid, and other private insurance companies reimbursed FAST LAB approximately $681,515.21 from FAST LAB x3722.

121. Your affiant notes that during the course of the investigation, in addition to the accounts identified above, to include accounts mentioned herein, for reasons unknown, were closed by the CEMHAN BIRICIK, and new accounts opened with Truist Bank and others, for the purpose of receiving direct payments, and subsequent transfers of illegally obtained Medicare funds, for payment of services Fast Lab did not provide. As such, the accounts that were closed, will be referenced within the paragraphs and accounts now sought for seizure, and the source of fraudulently obtained funding for each, identified therein.

122. As part of this investigation, records were obtained and reviewed for

financial involvement relative to allegations of violations of federal law by

CEMHAN BIRICIK and others known and unknown. The investigation determined,

the proceeds of the health care fraud scheme were transferred to other financial

accounts in the control of CEMHAN BIRICIK, Martin Perlin and/or Hasan Seyhun.

Having reviewed multiple accounts, it was determined that the accounts listed below

have been identified as receiving the proceeds of the scheme:

### FINANCIAL ACCOUNTS REQUESTED FOR SEIZURE

| Financial Institution | Account # | Account Name | Tier |
|---|---|---|---|
| Truist Bank | 1100031801794 | FAST LAB TECHNOLOGIES LLC | 1 |
| Truist Bank | 1100031801808 | FAST LAB TECHNOLOGIES LLC | 1 |
| Truist Bank | 1100031801816 | FAST LAB TECHNOLOGIES LLC | 2 |
| Truist Bank | 1100031802316 | FAST DOC LLC | 2 |
| Truist Bank | 1000209771798 | CEMHAN BIRICIK & Isabel BIRICIK | 2 |
| JP Morgan Chase Brokerage | 985-10771 | FAST LAB TECHNOLOIGIES LLC | 2 |
| JP Morgan Chase Bank | 895667860 | Zenith Business Advisory | 2 |
| JP Morgan Chase Bank | 738547733 | Hasan Seyhun | 3 |
| JP Morgan Chase Bank | 944733500 | Hasan Seyhun | 2 |
| JP Morgan Chase Bank | 582305663 | Soho Workspaces 2 Inc. | 3 |

| JP Morgan Chase Bank | 759192609 | Soho Workspaces 2 Inc | 3 |
|---|---|---|---|
| JP Morgan Chase Bank | 738295598 | Hasan Seyhun | 3 |
| Sun Trust Bank | 1000202882295 | CEMHAN BIRICIK/ISABEL BIRICIK | 2 |
| Robin Hood Brokerage Account | 825420938 | CEMHAN BIRICIK | 2 |
| Morgan Stanley | 730-091145 | CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN | 3 |
| Morgan Stanley | 730-091585 | CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN | 3 |
| Morgan Stanley | 730-091785 | CEMHAN BIRICIK | 3 |
| Bank of America | 009439190411 | Martin Perlin M.D. | 3 |
| So-Fi Bank | 411033934602 | CEMHAN BIRICIK & Isabel BIRICIK | 3 |
| So-FI Bank | 310043217728 | CEMHAN BIRICIK & Isabel BIRICIK | 3 |

123.   Accounts with the "Tier One" designation received cash deposits of illegal proceeds or deposits of Medicare funds as a result of fraudulently submitted claims by the operators of several entities working in conjunction with CEMHAM BIRICIK.   The accounts with the "Tier Two" designation received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from the "Tier One" account. Accounts

59

with a "Tier Three" designation, received transfers of funds from Tier Two and other accounts

## TIER ONE ACCOUNTS

**All funds on deposit in Truist Bank Account 1100031801794,**

**held in the name of FAST LAB TECHNOLOGIES LLC,**
**9623 Macchiato Ave, Boca Raton FL. 33496**

124.   **Truist Bank Account 1100031801794** held by FAST LAB TECHNOLOGIES LLC (FAST LAB x1794) was opened on October 31, 2024, following the closure of Fast Lab JP Morgan Chase Bank account 772378615, which previously served as the repository account to accept payments from Medicare for services rendered to its beneficiaries. JP Morgan Chase account 772378615 was originally opened in September of 2021 with Cemhan Biricik and Hassan D. Seyhun as the authorized signers. That account received approximately $47 million in Medicare, Medicaid and other insurer's payments prior to its closure and the establishment of the new Tier One Truist Bank repository account opened in October of 2024. The sole authorized signer on the new Tier One Truist account is CEMHAN BIRICIK.

125.   As of May of 2025, financial analysis determined that the new repository account has received approximately $105,884,41.00 in payments for purported services to health care beneficiaries, and transfers totaling $189,700. 00

from Truist Fast Lab accounts 1100031802316 and 1100031801816 respectively, both of which were opened shortly before or after closure of the Fast Lab JP Morgan Accounts in October of 2024.

126.   In as much as records show that FAST LAB Truist Bank account x1794 is the current repository account for the continued receipt of fraudulently obtained payments for services from Medicare, Medicaid, and other private insurance companies, thus, these funds and the funds that follow, constitute proceeds of health care fraud and conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds, and therefore subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Truist Bank Account 1100031801808
held in the name of FAST LAB TECHNOLOGIES LLC,
9623 Macchiato Ave, Boca Raton, FL 33496**

127.   Truist Bank Account 1100031801808 held in the name of Fast Lab Technologies LLC (FAST LAB x1808) was opened on October 31, 2024, following the closure of multiple Fast Lab business accounts previously held with JP Morgan Chase Bank. The authorized signer listed on the account is CEMHAN BIRICIK. The most recent statement obtained by subpoena, determined that as of May 14,

61

2025, this account received approximately $236,966.00 00 in payments for purported services to health care beneficiaries, and transfers totaling $513,000.00. Specifically, a transfer of $13,000.00 from Fast Lab account 1100031801794, and a wire transfer of $500,000.00 (November of 2024) from closed Tier One JP Morgan Fast Lab repository account 772378615, determined to have received $47,000,000.00 in fraudulently obtained payments from Medicare, Medicaid, and private insurers for services it did not provide.

128.   Records show that Truist Bank FAST LAB account x1808 is one of three current repository accounts for the receipt of payments for services from Medicare, Medicaid, and other private insurance companies, and, as such, it is a Tier One account.

129.   Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that FAST LAB TECHNOLOGIES LLC fraudulently billed the Medicare, Medicaid and other private insurance companies collectively, for over $51 million, and the funds were deposited into former JP Morgan Bank FAST LAB x8615 and current Truist Bank FAST LAB x1794 respectively. Thus, the funds contained in this account, constitutes proceeds of health care fraud and conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds, and therefore subject to seizure and civil forfeiture to the

United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**TIER TWO ACCOUNTS**

130.   Accounts with "Tier Two" designation are individually and personally owned by BIRICIK and his co-conspirators or their entitites that received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from "Tier One" accounts, both those included herein for seizure as well as other accounts that are presently closed, as receiving fraudulently obtained payments.  The Tier Two accounts that follow and sought for seizure, have been broken down and separated by individual ownership and control.

**All funds on deposit in Truist Bank Account 1100031801816,**

**held in the name of FAST LAB TECHNOLOGIES LLC,**
**9623 Macchiato Ave, Boca Raton, FL 33496**

131.   Truist Bank Account 1100031801816 held in the name of FAST LAB TECHNOLOGIES LLC (FAST LAB x1816) was opened on October 31, 2024. The authorized signer listed on the account is CEMHAN BIRICIK. Records were received and analyzed for the time frame of October 31, 2024, through May 30, 2025.

132.   Investigation and analysis determined, for the period running October 31, 2024, through May 30, 2025, this account received $950,788.00 in transfers from other Fast Lab accounts.  Specifically, this account received transfers totaling $264,080.00 from Truist Fast Lab account 1100031801794, previously identified as a Fast Lab repository account receiving $295,000.00 in illegally obtained Medicare and Medicaid funds for services it did not perform, and $589,608.00 from Tier One Truist Bank Fast Lab account 1100031801808, previously identified as receiving $749,966.00 in direct payments and transfers of Medicare and Medicaid for services it did not provide. This account also received an additional $97,100.00 in transfers from Tier Two Truist Bank account 1100031802316, which investigation determined that it received $144,158.00 in direct deposits and transfers from Fast Lab accounts previously identified herein.

133.   Given the facts outlined herein, probable cause exists to seize all funds on deposit in Truist Bank account 1100031801816 held in the name of FAST LAB TECHNOLOGIES LLC, as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  The investigation has traced at least $51.000,000.00 in likely fraud proceeds to this account as of November 29, 2024, even as the fraud scheme continues.  All funds on deposit in the account constitute property involved in money laundering. As such, this account is subject to

seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Truist Bank Account 1100031802316,**

**held in the name of Fast Doc LLC,**
**1150 NW 72nd Ave Tower 1 STE Miami FL 33126**

134.   Truist Bank Account 1100031802316, held in the name of Fast Doc, LLC (Fast Doc x2316) was opened on January 31, 2025. The sole signer listed on the account was CEMHA BIRICIK.  Records were received and analyzed for the time frame of January 31, 2025, through May 30, 2025,

135.   Investigation and analysis determined, since January 2025, this account received $144,158 in proceeds of CEMHAN BIRICIK illicit scheme to defraud the Medicare system and Private Health Care Insurers. Specifically, this account received $135,988.00 in direct payment from Medicare and other insurers for services it did not provide, and transfers of $2,620.00 and $5,550.00 respectively from Fast Lab accounts Tier One Account Truist Bank account 1100031801794 and Tier Two Truist Bank account 11000318018161816 previously identified herein, as receiving illicit funds as a result of CEMHAN's scheme to defraud the Medicare

65

system and other insurers.

136.   Thus, probable cause exists to seize all funds on deposit in Truist Bank

Account number 1100031802316, held in the name of Fast Doc LLC, 6398 1150

NW 72nd Ave Tower 1 STE Miami FL 33126 as the proceeds of health care fraud

(18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or

as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our

investigation has traced at least $144,158.00 in direct payments of Medicare funds to

include and transfers of Medicare funds which are likely fraud proceeds to this

account as of May 30, 2025,  even as the fraud scheme continues, and all funds on

deposit in the account constitute property involved in money laundering, and

therefore, is subject to seizure and civil forfeiture to the United States, pursuant to

18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal

forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C)

together with 28 U.S.C. § 2461.

**All funds on deposit in Truist Bank Account 1000209771798,**

**held in the name of CEMHAN BIRICIK and Isabel Biricik**

137.   Truist Bank Account 1000209771798, (BIRICIK x1798) was opened

on July 5, 2019, as a personal (checking) account. The signers listed on the account

were both CEMHAN BIRICIK and Isabel BIRICIK.  Records were received and

analyzed for the time frame of January 2023 through November 2024.  The last statement analyzed, dated November 29, 2024, showed the account held a balance of $16.73 but fluctuates depending on deposit activity.

138.   Investigation and analysis determined that since 2024 this account was nearly fully funded by and received over $5.5 million, through direct transfers from the previously identified closed Tier One JP Morgan FAST LAB 7723786158615 and Tier One FAST LAB 828163722 both of which were previously identified as receiving more than $47,000,000.00 of illegally obtained funds from Medicare and Private Health Care Insures.  This account also received more than 3 million in transfers from the Biricik's JP Morgan Chase FAST Lab Brokerage account identified as account # 985-10771.

139.   Below is a table detailing BIRICIK x85125 deposits via year:

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| FAST LAB Brokerage x0771 | 2024 | 3,049,840.47 |
| FAST LAB x5031 | 2024 | 1,951,000.00 |
| FAST LAB x8615 | 2024 | 113,000.00 |
| Fast Lab Gusto Payroll | 2024 | 219,286.76 |
| Bit Byte Bit x5978 | 2024 | 80,000.00 |
| WebDev x0127 | 2024 | 40,000.00 |
| | Total: | $5,453,127.23 |

140.   Given the facts contained within this affidavit, probable cause exists to

seize all funds on deposit in Truist Bank Account 1000209771798, held in the name of CEMHAN BIRICIK and Isabel Biricik, as the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). Our investigation has traced at least $5.4 million in likely fraud proceeds to this account as of November 29, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in JP Morgan Chase Brokerage Bank Account 985-10771, held in the name of FAST LAB TECHNOLOGIES LLC, 1178 Broadway, Suite 401, New York, NY 10001-5404**

141.   JP Morgan Chase Brokerage Bank Account 985-10771 held in the name of FAST LAB TECHNOLOGIES LLC (FAST LAB x0771) was opened on May 7, 2024. The signer listed on the account was CEMHAN BIRICIK.   Records were received and analyzed for the time frame of May 2024 through September 2024. The last statement analyzed, dated September 30, 2024, showed the account held a balance of $1.08.

142.   Review of records, determined that this account received $4 million in transfers from former Tier One JP Morgan Chase Bank FAST LAB account 9385550315031. Below is a table detailing the deposits via year:

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| FAST LAB x5031 | 2024 | 4,000,000.00 |
| | **Total:** | **$4,000,000.00** |

143.   Your Affiant notes that this brokerage account was primarily funded by former, but closed, TIER ONE JP Morgan Bank Fast Lab account 938555031. As previously reported, this account received direct transfers of illegally obtained Medicare funds totaling $20,000,000.00 from former TIER ONE JP Morgan Chase Bank Fast Lab account 772378615, which was previously identified as one of the Fast Lab repository accounts receiving more than $47,000,000.00 in fraudulently received payments for services it did not provide.

144.   Thus, probable cause exists to seize all funds on deposit in JP Morgan Chase Brokerage Bank Account 985-10771, held in the name of FAST LAB TECHNOLOGIES LLC, as the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has traced at least $4 million in likely fraud proceeds to this account as of September 30, 2024,

even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in JP Morgan Chase Bank Account 725611005,**

**held in the name of Zenith Business Advisory Solutions Inc.,**
**4142 24th St., Apt. 1710, Long Island City, NY 11101**

145.   JP Morgan Chase Bank Account 725611005 held in the name of Zenith Business Advisory Solutions Inc. (Zenith x1005) was opened on May 24, 2021. The signers listed on the account were Hasan Seyhun and Murat Akcay.   Records were received and analyzed for the time frame of September 2021 through October 2024.

146.   Investigation and analysis determined that between 2022 and 2023, Fast Lab's then-Chief Operating Officer Hasan Seyhun, a relative of Cemhan Biricik, received more than $2.5 million in deposits to this account, from Fast Lab, through its Gusto employee payroll account.

147.   Your affiant notes, that the funds deposited into the payroll account for distribution to its employees, was derived from the fraudulently obtained payments from Medicare, Medicaid and other insurers for services Fast Lab did not provide, Below is a table detailing the deposits via year:

70

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| Gusto Payroll | 2022 | 100,031.70 |
| Gusto Payroll | 2023 | 2,458,000.00 |
| | **Total:** | **$2,558,031.70** |

148.   Thus, probable cause exists to seize all funds on deposit in Tier Two JP Morgan Chase Bank Account 725611005 held in the name of Zenith Business Advisory Solutions Inc., 4142 24th St., Apt. 1710, Long Island City, NY 11101 as the proceeds of health care fraud (18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  The investigation has traced at least $2.5 million in fraud proceeds to this account as of October 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in JP Morgan Chase Bank Account 738547733, held in the name of Hasan Seyhun, 447 Broadway FL. 2, New York, NY 10013-2562**

149.   JP Morgan Chase Bank Account 738547733 held in the name of Hasan

Seyhun (Seyhun x7733) was opened on December 19, 2020. The signer listed on the account was Hasan Seyhun.  Records were received and analyzed for the time frame of December 2020 through November 2024. The last statement analyzed dated November 27, 2024, showed the account held a balance of $11,225.51.

150.   Investigation and analysis determined from 2022 through 2023 this account received $25,000 from the previously identified Tier One account, JP Morgan FAST LAB 8281637223722 closed repository account, and former Tier One JP Morgan Bank FAST LAB 7723786158615 closed repository account, previously identified as receiving more than $47,000,000.00 of illegally obtained funds from Medicare and Private Health Care Insures.  In addition, $600,000 was transferred to this account from two accounts identified as Tier Three JP Morgan Bank Soho Workspaces account 582305663 and Tier 2 JP Morgan Chase Bank 895667860 which was determined to have received 2.5 million in payments from the Fast Lab payroll Gusto account, which was funded by Medicare payments in its repository account as payment for services that Fast Lab did not provide.  Below is a table detailing the deposits via year:

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| FAST LAB x3722 | 2022 | 22,500.00 |
| FAST LAB x8615 | 2022 | 1,000.00 |
| FAST LAB x8615 | 2023 | 1,500.00 |

| | | |
|---|---|---|
| Zenith x7860 | 2023 | 93,000.00 |
| Soho Workspaces x5663 | 2024 | 570,000.00 |
| | **Total:** | **$688,000.00** |

151.   Thus, probable cause exists to seize all funds on deposit in JP Morgan Chase Bank Account 738547733, held in the name of Hasan Seyhun, 447 Broadway FL. 2, New York, NY 10013-2562 as the proceeds of health care fraud (18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956), and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**JP Morgan Chase Bank Account 944733500,
held in the name of Hasan Seyhun,
447 Broadway, Floor 2, New York, NY 10013-2562**

152.   JP Morgan Chase Bank Account 944733500 held in the name of Hasan Seyhun or Mert Kultur (Seyhun x3500) was opened on August 29, 2019. The signer listed on the account was initially Hasan Seyhun, Mert Kultur was subsequently added as a signer to the account. Records were received and analyzed for the time frame of May 2024 through November 2024. The last statement analyzed, dated

November 14, 2024, showed the account held a balance of $913.32.

153.   Investigation and analysis determined from 2022 through 2024 this account received over $422,782.88 from Tier One Fast Lab JP Morgan Chase Bank account 828163722, Tier Two JP Morgan Chase Bank account 895667860, and Tier Three JP Morgan Chase Bank account 725611005 previously identified as receiving in excess of $2.5 million from the Fast Lab Gusto payroll account as a result of Biricik and Seyhan's illegal scheme to defraud the Medicare and Private health Care Insures.  The sources of the deposits are detailed in the table below:

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| Zenith x1005 | 2022 | 77,325.00 |
| FAST LAB x3722 | 2022 | 65,000.00 |
| Seyhun x7733 | 2022 | 35,077.88 |
| Zenith x7860 | 2023 | 152,000.00 |
| Seyhun x7733 | 2023 | 45,130.00 |
| FAST LAB x3722 | 2023 | 12,350.00 |
| Zenith x1005 | 2023 | 33,000.00 |
| Sehun x7733 | 2024 | 2,900.00 |
| | Total: | $422,782.88 |

154.   Thus, probable cause exists to seize all funds on deposit in JP Morgan Chase Bank Account 944733500, held in the name of Hasan Seyhun, 447 Broadway, Floor 2, New York, NY 10013-2562 as the proceeds of health care fraud (18 U.S.C.

§ 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). Our investigation has traced at least $422,782.88 in likely fraud proceeds to this account as of November 14, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

155.   There is also probable cause to believe that at least two transfers from Hasan Seyhun's JP Morgan Chase Bank Tier Two account 73854773, constitute a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States, as further detailed below.

| Transferred from | Date | Transferred to | Amount |
|---|---|---|---|
| Seyhun x7733 | 08/14/2024 | Soho Workspaces 2 x5663 | 20,000.00 |

| Seyhun x7733 | 09/08/2024 | Soho Workspaces 2 x5663 | 500,000.00 |

## TIER THREE ACCOUNTS

156.   Accounts with a "Tier Three" designation are individually and personally owned by BIRICIK and his co-conspirators or their entitites that received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from "Tier Two" accounts, included herein for seizure to include other accounts that are presently closed, and identified as receiving fraudulently obtained payments.  The Tier Three accounts that follow and sought for seizure, have been broken down and separated by individual ownership and control.

**All funds on deposit in JP Morgan Chase Bank Account 759192609,
held in the name of Soho Workspaces 2 Inc.,
447 Broadway FL 2, New York, NY 10013-2562**

157.   JP Morgan Chase Bank Account 759192609 held in the name of Soho Workspaces 2 Inc. (Soho Workspaces x2609) was opened on August 3, 2021.  The signers listed on the account was Hasan Seyhun and Murat Akcay. Records were received and analyzed for the time frame of September 1, 2021, through October 31, 2024.  The last statement analyzed, dated October 31, 2024, showed the account held a balance of $27,558.47

158.   Investigation determined that in 2024, more than $1.4 million was transferred from the JP Morgan Chase Bank Fast Lab Gusto payroll account, and JP Morgan Chase Zenith x1005 business account controlled by Seyhun, to his JP Morgan Chase Bank Soho Workspaces2 account 759192609 which is also owned and controlled by Hasan Seyhun. As previously reported, the Fast Lab payroll account was funded by fraudulently obtained Medicare payments directly from its former JP Morgan Chase Bank Tier One repository account 772378615 as payment for services that Fast Lab did not provide.

Below is a table detailing the deposits:

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| Fast Lab Gusto Payroll | 2024 | 1,325,000.00 |
| Zenith x1005 | 2024 | 89,583.70 |
| Zenith x7860 | 2024 | 5,616.04 |
| | Total: | **$1,414,583.70** |

159.   There is probable cause to believe that at least 30 transfers from Hasan Seyhun's Tier Three account constitute a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C.

§§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States, as further detailed below.

| Transferred from | Date | Transferred to | Amount |
|---|---|---|---|
| Zenith x1005 | 12/30/2022 | Seyhun x3500 | 77,350.00 |
| Zenith x1005 | 02/27/2023 | Seyhun x7733 | 29,000.00 |
| Zenith x1005 | 04/19/2023 | Zenith x7860 | 125,190.00 |
| Zenith x1005 | 04/19/2023 | Seyhun x5598 | 40,000.00 |
| Zenith x1005 | 04/19/2023 | Soho Workspaces x3110 | 40,000.00 |
| Zenith x1005 | 04/19/2023 | Seyhun x7733 | 31,000.00 |
| Zenith x1005 | 04/19/2023 | Zenith x7860 | 125,190.00 |
| Zenith x1005 | 04/25/2023 | Zenith x7860 | 124,810.00 |
| Zenith x1005 | 05/08/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 05/15/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 05/20/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 05/26/2023 | Seyhun x5598 | 20,000.00 |
| Zenith x1005 | 05/26/2023 | Seyhun x5598 | 10,000.00 |
| Zenith x1005 | 05/29/2023 | Zenith x7860 | 75,000.00 |
| Zenith x1005 | 05/31/2023 | Zenith x7860 | 100,000.00 |
| Zenith x1005 | 06/09/2023 | Seyhun x5598 | 50,000.00 |
| Zenith x1005 | 06/20/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 06/22/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 06/22/2023 | Zenith x7860 | 98,993.33 |
| Zenith x1005 | 06/28/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 07/11/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 07/12/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 07/19/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 08/11/2023 | Zenith x7860 | 125,000.00 |
| Zenith x1005 | 09/17/2023 | Zenith x7860 | 50,000.00 |
| Zenith x1005 | 10/30/2023 | Seyhun x3500 | 26,000.00 |

| Zenith x1005 | 11/05/2023 | Seyhun x7733 | 10,000.00 |
|---|---|---|---|
| Zenith x1005 | 11/21/2023 | Seyhun x7733 | 15,000.00 |
| Zenith x1005 | 11/25/2023 | Seyhun x7733 | 10,000.00 |
| Zenith x1005 | 12/06/2023 | Seyhun x7733 | 20,000.00 |
| Zenith x1005 | 12/21/2023 | Zenith x7860 | 65,000.00 |
| Zenith x1005 | 01/03/2024 | Seyhun x7733 | 20,000.00 |
| Zenith x1005 | 02/06/2024 | Soho Workspaces x2609 | 89,583.70 |
| Soho Workspaces x2609 | 02/26/2024 | Soho Workspaces 2 x5663 | 1,420,199.74 |

160.   Thus, probable cause exists to seize all funds on deposit in JP Morgan Chase Bank Account 759192609 held in the name of Soho Workspaces 2 Inc., 447 Broadway FL 2, New York, NY 10013-2562 as the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). Our investigation has traced at least $1.4 million in likely fraud proceeds to this account as of October 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in JP Morgan Chase Bank Account 582305663,**

### held in the name of Soho Workspaces 2 Inc.,
### 447 Broadway FL 2, New York, NY 10013-2562

161.   JP Morgan Bank held in the name of Soho Workspaces 2, Inc., is one

of three accounts with identical names, listing Hasan Seyhun as the sole signer.

Investigation determined that this account 582305663 received a single transfer of

$1.4 million dollars from in February of 2024, from JP Morgan Chase Bank Tier

Three account held in the name of Soho Workspaces 2 Inc., listed above and

possessing JP Morgan Bank Account number 759192609.

162.   As previously reported, JP Morgan Bank Account number 759192609

received more than $1.4 million in transferred from the JP Morgan Chase Bank Fast

Lab Gusto payroll account, and JP Morgan Chase Zenith x1005 business account

controlled by Seyhun, to the Soho Workspaces2 x2609 which is also owned and

controlled by Seyhun.  As noted, the Fast Lab payroll account was funded by

fraudulently obtained Medicare payments from its repository account as payment for

services that Fast Lab did not provide.

163.   Thus, probable cause exists to seize all funds on deposit in JP Morgan

Chase Bank Account 582305663, held in the name of Soho Workspaces 2 Inc., 447

Broadway FL 2, New York, NY 10013-2562 as the proceeds of health care fraud (18

U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as

property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our

investigation has traced at least $1.4 million in likely fraud proceeds to this account as of October 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in JP Morgan Chase Bank Account 738295598, held in the name of Hasan Seyhun**

164.   Investigation determined that JP Morgan Chase Bank Account 738295598 was opened in December 2020, with Hasan Seyhun is listed as the sole signer on the account.

165.   In addition to deposits totaling $3,000,000.00 into accounts previously identified as owned and controlled by Hasan Seyhun, investigation determined that this account received three transfers totaling $43,000.00 from Fast Lab former JP Morgan Chase Bank Tier One repository accounts, identified as Fast Lab 772378615, and Fast Lab 8281637223722 respectively, both reported to have received more than $47,000,000 in Medicare funds for services Fast Lab did not provide.

166.   Thus, probable cause exists to seize all funds on deposit in JP Morgan

Chase Bank Account 738295598 held in the name of Hasan Seyhun 447 Broadway FL 2, New York, NY 10013-2562 as the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956) )  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has traced at least $$43,000.00 in likely fraud proceeds to this account as of October 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Sun Trust Bank Account 1000202882295, held in the name of CEMHAN BIRICIK or ISABEL BIRICIK**

167.   Review of available records determined that Sun Trust Bank Account 1000202882295 was opened on December 18, 2020. The signers listed on the account were Cemhan Biricik and Isabel Biricik.  Records were received and analyzed and showed the account received a transfer of $100,000.00 from Tier One Fast Lab Truist account 1100031801808, which is the repository account opened in October of 2024 after Cemhan Biricik on behalf or Fast Lab, closed its Tier One

repository accounts with JP Morgan Chase Bank. The current Truist 1100031801808 repository account received more than $749,966 in fraudulently Medicare and Medicaid payments, for services it did not provide.

168.    Thus, probable cause exists to seize all funds on deposit in Sun Trust Bank Account 1000202882295, held in the name of Cemhan Biricik and Isabel Biricik , as the proceeds of health care fraud (18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has traced at least $100,000.00 in likely fraud proceeds to this account,  even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering, and therefore, is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Robinhood Account 825420938,
held in the name of CEMHAN BIRICIK**

169.    Records were received and analyzed for the time frame of January 1, 2020, through October 31, 2024.  The last statement analyzed, dated October 31, 2024, showed the account held a Robinhood Account 825420938 was held in the name of CEMHAN BIRICIK and opened on July 29, 2019. The sole signer listed on

the account was CEMHAN balance of $1,105,228.22.

170.   From January 2023 through April 2024 over $957,500.00 was transferred from former Tier Three JP Morgan Chase Bank Mavric Marketing 6720826632663 identified as receiving $253,700 from former Tier One JP Morgan Chase repository account 772378615 and $60,000 from former Tier One JP Morgan Chase Bank account 828163772 respectively to Robinhood Brokerage account 82542093.

171.   Below is a table detailing the deposits:

| Deposit Source | Deposit Month/Year | Deposit Total |
|---|---|---|
| Mavric x2663 | January 2023 | 7,500.00 |
| Mavric x2663 | May 2023 | 150,000.00 |
| Mavric x2663 | June 2023 | 300,000.00 |
| Mavric x2663 | July 2023 | 300,000.00 |
| Mavric x2663 | August 2023 | 200,000.00 |
| | **Total:** | **$957,500.00** |

172.   Further analysis of disbursements and withdrawal activity in Robinhood x0938 revealed the following account summary as of October 31, 2024:

- Brokerage Cash Balance: $2.43

84

- Deposit Sweep Balance (uninvested cash): $531,523.91

- Total Securities Balance: $573,701.88

- **Portfolio Total Value: $1,105,228.22**

173.    Although the Robinhood balances have since decreased, probable cause exists to seize all funds on deposit in Robinhood Account 825420938, held in the name of CEMHAN BIRICIK, as the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has traced at least $957,500 in likely fraud proceeds to this account as of October 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering.

174.    There is also probable cause to believe that at least 10 transfers from Cemhan Biricik's Tier Three accounts constitute a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States, as

further detailed below.

| Transferred from | Date | Transferred to | Amount |
|---|---|---|---|
| Bit Byte Bit x5978 | 03/14/2024 | Mavric x2663 | 20,000.00 |
| Bit Byte Bit x5978 | 03/25/2024 | BIRICIK x85125 | 50,000.00 |
| Bit Byte Bit x5978 | 04/11/2024 | Mavric x2663 | 10,000.00 |
| Bit Byte Bit x5978 | 05/21/2024 | BIRICIK x85125 | 30,000.00 |
| WebDev x0127 | 06/06/2024 | BIRICIK x85125 | 10,000.00 |
| Bit Byte Bit x5978 | 07/02/2024 | Mavric x2663 | 10,000.00 |
| Bit Byte Bit x5978 | 08/15/2024 | BIRICIK x85125 | 14,000.00 |
| WebDev x0127 | 08/26/2024 | BIRICIK x85125 | 10,000.00 |
| WebDev x0127 | 08/26/2024 | BIRICIK x85125 | 20,000.00 |
| FAST LAB Brokerage x0771 | 09/26/2024 | BIRICIK x85125 | 3,049,000.00 |

**The three Morgan Stanley Target Assets:**

**All funds on deposit in Morgan Stanley Account 730-091145, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN;**

**All funds on deposit in Morgan Stanley Account 730-091585, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN; and**

**All funds on deposit in Morgan Stanley Account 730-091785, held in the name of CEMHAN BIRICIK**

175.   Cemhan Biricik and Isabel Biricik control three accounts at Morgan

Stanley, a prominent investment bank, as identified above.  On January 27, 2025,

86

Biricik instructed Dennis.Lee@morganstanley.com to wire $1,154,250.00 to Cirrus

Design Corp to complete the purchase of the Cirrus aircraft bearing tail number

203FD.  The email read:

> total wire amount $1,154,250.00
> I've also attached the invoice for our records
> Please wire asap

176.   The email – from BIRICIK's ceo@fastlabtech.com email address – was

signed "CB" and noted in the signature block that Biricik is the CEO of Fast Lab.

Below is a screenshot of the email:



| Tags | ceo |
|---|---|
| To | Dennis.Lee@morganstanley.com |
| From | Cemhan Biricik <ceo@fastlabtech.com> |
| Submitted Date/Time - UTC+00:00 (M/d/yyyy) | 1/27/2025 4:18:29.000 PM |
| Delivered Date/Time - UTC+00:00 (M/d/yyyy) | 1/1/1970 12:00:00.000 AM |
| Subject | Wire instructions and total amount due |
| Body | |

**Cirrus Design Corp. Wire Transfer Instructions**

*Name of Bank:* Wells Fargo Bank

*Address of Bank:* 420 Montgomery Street, San Francisco, CA 94104

*Account Name:* Cirrus Design Corp. Checking Account

*ABA/Routing Number:* 121000248 (Used for most domestic transfers)

*SWIFT/BIC Code:* WFBIUS6S (Most commonly used when transferring funds to the US from a foreign country.)

*Account Number:* 4133389887

*Other Instructions:*

Reference company name or invoice number(s)

When placing a wire transfer request please ensure that the total wire amount reflects any fees the financial institution may charge for the service.

When using an aircraft order payment please reference the buyer's name and/or payee's serial number in the "other instructions" section of the wire transfer request. Federal tax ID number 04-1414374.

total wire amount $1,154,250.00

I've also attached the invoice for our records

Please wire asap thanks

--

**C  B**
CEO

| | |
|---|---|
| Phone: | 9175039404 |
| Email: | ceo@fastlabtech.com |
| Website: | FastLabtech.com |
| Address: | FAST LAB, 1178 Broadway, N NY 10001 |

177.   Evidence gained from grand jury subpoena service indicates that Cemhan BIRICIK and Isabel Biricik funded their Morgan Stanley investments with fraud proceeds originally collected in Chase and Robinhood accounts.  This

corresponds to email records indicating that Cemhan Biricik emailed his Chase and Robinhood statements to Morgan Stanley at the time of account opening, for the apparent purpose of transferring balances.

178.   During the course of the investigation, the investigators traced approximately $1.1 million in transfers and deposits into the Robinhood Brokerage account 825420938 held in the name of BIRICIK, and another $5.6 million in deposits and transfers to JP Morgan Chase Brokerage Account 985-10771 held in the name of Fast Lab Technologies LLC, for a total of $6.7 million dollars. However, during preparation and anticipation of seizing these accounts, although still open, most of the funds were either withdrawn, or moved to an unknown account.

179.   In a similar pattern, JP Morgan Chase Account 756-11453, in the name of Cemhan Biricik and Isabel Biricik JTWROS, had an account value of $5,819,677.84 at the end of November 2024.  By the end of December 2024, the ending account value was $94.53.

180.   The financial investigation determined that the Fast Lab JP Morgan Brokerage Account, received approximately $4 million dollars in transfers from former JP Morgan Chase Bank Fast Lab repository account x5031, created to receive payments from Medicare, Medicaid, and other insures, for services to beneficiaries of respective Health Care Insurance Programs. It was further

89

determined that Robinhood Account 825420938, received $957,500.00 in transfers from former JP Morgan Chase Bank x2663, held in the name of Mavric, which is/was an account owned and or controlled by CENHAN BIRICIK, which as previously reported in this affidavit, received $2,104,241 in proceeds of CEMHAN BIRICIK and Martin Perlin's illicit scheme to defraud the Medicare Program and Private Health Care Insurers, for payment for services Fast Lab did not provide.

181.   As previously reported in this affidavit, BIRICIK's former JP Morgan personal Account x5125, received more than $5.5 million in transfers from former Fast Lab JP Morgan Chase Bank repository account x8615. Both the personal and repository accounts were subsequently closed prior to drafting of this seizure warrant.

182.   Thus there is probable cause to believe that the transfers which funded the three Morgan Stanley account(s) constitute a violation of 18 U.S.C. § 1957 in that: (1) each transfer was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States, as further detailed below.

183.   As of **June 30, 2025**, the three Morgan Stanley accounts funded with fraud proceeds had the following remaining balances:

- $4,441,783.38 in Morgan Stanley Account 730-091145, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN;

- $134,736.48 in Morgan Stanley Account 730-091585, held in the name of CEMHAN BIRICIK & ISABEL C BIRICIK JT TEN; and

- $84,143.60 in Morgan Stanley Account 730-091785, held in the name of CEMHAN BIRICIK

184.   Since these accounts were funded with fraud proceeds, and each transaction thus funding the account was a money laundering transaction, probable cause exists to seize all funds on deposit the three identified Morgan Stanley Accounts as the proceeds of health care fraud (18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has uncovered evidence of over $3 million in likely criminal proceeds in these Morgan Stanley account(s) counting only the September 2024 and January 2025 amounts alone, even as the fraud scheme continues, and all funds on deposit in such accounts constitute property involved in money laundering, and therefore, is subject to seizure and civil

forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C),

and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a)

and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Social Financial Bank Account 411033934602,
with Cemhan Biricik listed as the primary account holder and Isabel Biricik
as a joint account holder**

185.   A review of available records determined that CEMHAN is the primary

account holder, and Isabel Biricik, was listed as a joint account holder.  The address

was listed as the subject premises of CHEMAN BIRICIK and ISABEL BIRICIK.

195.   Investigation determined that this account received two transfers totaling

$61,530.00 from Biricik's JP Morgan Chase Bank personal checking account x5125

account, an account previously identified as receiving in excess of $5.5 million dollars

in transfers of fraudulently obtained Medicare funds as a result of Biricik's illicit

scheme to defraud the Medicare Program for purported services,  Fast Lab, did not

provide.

186.   Thus, probable cause exists to seize all funds on deposit in Social

Financial Bank Account 411033934602, held in the name of Cemhan Biricik and

Isabel Biricik, as the proceeds of health care fraud (18 U.S.C. § 1347) and

conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in

money laundering (18 U.S.C. §§ 1957 and 1956).  Our investigation has traced at

least $61,500.00 in likely fraud proceeds to this account as of November 25, 2024,

even as the fraud scheme continues, and all funds on deposit in the account

constitute property involved in money laundering, and therefore, is subject to seizure

and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

(C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. §

982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

### All funds on deposit in Social Financial Bank Account 310043217728, with Cemhan Biricik listed as the primary account holder and Isabel Biricik as a joint account holder

187.   A review of available records determined that CEMHAN is the primary

account holder.  The address was listed as the subject premises of CHEMAN

BIRICIK and ISABEL BIRICIK.

188.   It was also determined that this account received two transfers totaling

$74,500.00 from Biricik's Robinhood Brokerage account 310043217728, an account

previously identified as receiving in excess of $957,500.00  dollars in transfers from

Biricik's JP Morgan Chase Bank held in the name of Mavric Marketing x2663,

previously identified as receiving $2.1 million in proceeds of fraudulently obtained

Medicare funds as a result of Biricik's illicit scheme to defraud the Medicare

Program for purported services Fast Lab, did not provide.   Therefore, all funds on

deposit in this account are subject to seizure and civil forfeiture to the United States,

pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and

criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. §

93

981(a)(1)(C) together with 28 U.S.C. § 2461.

**All funds on deposit in Bank of America Bank Account 009439190411, held in the name of Martin Perlin M.D., P.C., 487 E., Main Street, Suite 123, Mount Kisco, NY 10549**

189.    Bank of America Bank Account 009439190411 held in the name of Martin Perlin M.D., P.C. (Perlin x0411) was opened in 2005. The signers listed on the account was Martin Perlin and Nancy Perlin. Records were received and analyzed for the time frame of January 1, 2020, through April 31, 2024.  The last statement analyzed, dated April 30, 2024, showed the account held a balance of $40,166.87.

190.    **From January through was transferred from Tier Two account, Gusto Payroll, to Zenith Perlin x0411. Below is a table detailing the deposits:**

| Deposit Source | Deposit Year | Deposit Total |
|---|---|---|
| Gusto Payroll | 2021 | 21,525.05 |
| Gusto Payroll | 2021 | 27,608.34 |
| Gusto Payroll | 2022 | 70,599.55 |
| Gusto Payroll | 2023 | 12,000.01 |
|  | Total: | $131,732.95 |

191.    **Thus, probable cause exists to seize all funds on deposit in Bank of America Bank Account 009439190411 held in the name of Martin Perlin M.D., P.C., 487 E., Main Street, Suite 123, Mount Kisco, NY 10549 as the proceeds of health care fraud (18 U.S.C. § 1347)  and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§**

94

1957 and 1956).  Our investigation has traced at least $131,732.95 in likely fraud proceeds to this account as of April 31, 2024, even as the fraud scheme continues, and all funds on deposit in the account constitute property involved in money laundering.

192.    There is also probable cause to believe that at least ___ transfers from Martin Perlin's Tier Three account constitute a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States, as further detailed below.

| Transferred from | Dat | Transferred to | Amou |
|---|---|---|---|
| Perlin x0411 | 03/1 3 | Transfer Martin Perl MD | $50,00 0 |
| Perlin x0411 | 03/2 3 | Transfer Martin Perl MD | $50,00 0 |
| Perlin x0411 | 04/0 3 | Transfer Martin Perl MD | $50,00 0 |
| Perlin x0411 | 04/2 3 | Transfer Martin Perl MD | $10,00 0 |
| Perlin x0411 | 04/2 3 | Transfer Martin Perl MD | $10,00 0 |
| Perlin x0411 | 05/0 | Transfer Martin Perl | $50,00 |

| | 3 | MD | 0 |
|---|---|---|---|
| Perlin x0411 | 08/3 3 | Online Banking Tran | $10,00 0 |

193.   **The accounts with a "Tier Four" designation are individually and personally owned and or controlled accounts that received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from the "Tier Three" accounts listed above, both those included herein for seizure as well as other accounts that are presently closed, as receiving fraudulently obtained payments.  The Tier Four accounts that follow and sought for seizure, have been broken down and separated by individual ownership and control.**

**VEHICLES AND AIRCRAFT TO BE SEIZED**

**2022 Ford Bronco Raptor (VIN: 1FMEE5JR1NLA50344)**

194.   On January 30, 2023, a purchase was made from former JP Morgan Bank FAST LAB Account 772378615 in the amount of $110,385.11 made payable to Grieco Ford of Delray Beach for the purchase of a 2022 Ford Bronco Raptor. The vehicle was registered to FAST LAB TECHNOLGIES LLC or CEMHAN BIRICIK at BIRICIK's residential address at 17662 Circle Pond Ct., Boca Raton, FL 33496.

195.   Your affiant asserts, that as previously reported, JP Morgan Fast Lab Account, 772378615 previously served as the repository account to accept payments

from Medicare and Medicaid, for services rendered to its beneficiaries. JP Morgan Chase account 772378615 was originally opened in September of 2021 with Cemhan Biricik and Hassan D. Seyhun as the authorized signers. That account received approximately $47,000,000.00 in Medicare, Medicaid and other insurer payments for services it did not provide.  The account was subsequently closed prior to the establishment of the new Truist Bank repository account opening in October of 2024. The sole authorized signer on the Truist account is CEMHAN BIRICIK.

196.   Thus, probable cause exists to seize the 2022 Ford Bronco Raptor VIN:1FMEE5JR1NLA50344 as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  The asset is subject to seizure and civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

## 2022 Ford Bronco Sport (VIN: 3FMCR9C69NRE24285)

197.   On January 30, 2023, a purchase was made from former JP Morgan Bank FAST LAB account 772378615 in the amount of $41,014.01 made payable to Grieco Ford of Delray Beach for the purchase of a 2022 Ford Bronco. The vehicle was registered to FAST LAB TECHNOLGIES LLC or CEMHAN BIRICIK at BIRICIK's previous residential address at 6398 Amberwoods Dr., Boca Raton, FL

97

33433.

198.    Your affiant asserts, that as previously reported, JP Morgan Fast Lab

Account, 772378615 previously served as the repository account to accept payments

from Medicare and Medicaid, for services rendered to its beneficiaries. JP Morgan

Chase account 772378615 was originally opened in September of 2021 with

Cemhan Biricik and Hassan D. Seyhun as the authorized signers. That account

received approximately $47,000,000.00 in Medicare, Medicaid and other insurer

payments for services it did not provide.  The account was subsequently closed prior

to the establishment of the new Truist Bank repository account opening in October

of 2024. The sole authorized signer on the Truist account is CEMHAN BIRICIK.

199.    Thus, probable cause exists to seize the 2022 Ford Bronco

VIN: 3FMCR9C69NRE24285 as proceeds of health care fraud (18 U.S.C. § 1347)

and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved

in money laundering (18 U.S.C. §§ 1957 and 1956).  The asset is subject to seizure

and civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

(C), and/or subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a)

and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

### 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960)

200.   On December 26, 2023, a cashier's check was purchased drawn on

funds from former JP Morgan FAST LAB Account 772378615 in the amount of

$103,294.77 made payable to Rivian Automotive for the purchase of a 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960). The vehicle was registered to CEMHAN BIRICIK and FAST LAB TECHNOLOGIES LLC at BIRICIK's residential address at 17662 Circle Pond Ct., Boca Raton, FL 33496 at that time.

201.   Your affiant asserts, that as previously reported, JP Morgan Fast Lab Account, 772378615 previously served as the repository account to accept payments from Medicare and Medicaid, for services rendered to its beneficiaries. JP Morgan Chase account 772378615 was originally opened in September of 2021 with Cemhan Biricik and Hassan D. Seyhun as the authorized signers. That account received approximately $47,000,000.00 in Medicare, Medicaid and other insurer payments for services it did not provide.  The account was subsequently closed prior to the establishment of the new Truist Bank repository account opening in October of 2024. The sole authorized signer on the Truist account is CEMHAN BIRICIK.

202.   Thus, probable cause exists to seize the 2023 Rivian R1T VIN: 7FCTGAAA7PN021960 as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). The asset is subject to seizure and civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

**2023 Bentley Bentayga (VIN: SJAAR2ZVXPC023963)**

203.   On December 30, 2023, a cashier's check was purchased drawn on funds from former JP Morgan FAST LAB Account 772378615 in the amount of $373,365.25 made payable to Braman Motorcars for the purchase of a 2023 Bently Bentayga VIN: SJAAR2ZVXPC023963. BIRICIK was the sole signer on the purchase agreement. The vehicle was registered to FAST LAB TECHNOLOGIES LLC at BIRICIK's residential address at 17662 Circle Pond Ct., Boca Raton, FL 33496.

204.   Your affiant asserts, that as previously reported, JP Morgan Fast Lab Account, 772378615 previously served as the repository account to accept payments from Medicare and Medicaid, for services rendered to its beneficiaries. JP Morgan Chase account 772378615 was originally opened in September of 2021 with Cemhan Biricik and Hassan D. Seyhun as the authorized signers. That account received approximately $47 million in Medicare, Medicaid and other insurer payments for services that Fast Lab did not provide.  The account was subsequently closed prior to the establishment of the new Truist Bank repository account opened in October of 2024. The sole authorized signer on the Truist account is CEMHAN BIRICIK.

205.   Thus, probable cause exists to seize the 2023 Bently Bentayga VIN: SJAAR2ZVXPC023963 as proceeds of health care fraud (18 U.S.C. § 1347) and

conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). The asset is subject to seizure and civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

### 2023 Lamborghini Urus (VIN: ZPBUC3ZLXPLA25853).

206.    On December 29, 2023, BIRICIK purchased a cashier's check drawn on funds from former JP Morgan Chase Bank FAST LAB Account 938555031 in the amount of $358,928 made payable to Lamborghini of Palm Beach, for the purchase of a 2023 Lamborghini Urus. BIRICIK used his American Express credit card to provide a down payment of $30,688.77. The vehicle was registered to CEMHAN BIRICIK and FAST LAB TECHNOLOGIES LLC at BIRICIK's residential address at 17662 Circle Pond Ct., Boca Raton, FL 33496 at that time.

207.    JP Morgan Chase Bank Account 938555031 held in the name of FAST LAB TECHNOLOGIES LLC (FAST LAB x5031) was opened on March 30, 2023. The authorized signer listed on the account was CEMHAN BIRICIK. Records were received and analyzed for the time frame of March 2023 through November 2024.

208.    Investigation and analysis determined, since the JP Morgan Chase Bank FAST LAB account x5031 was opened, it was nearly fully funded by Tier One account, FAST LAB x8615. From 2023 through 2024, FAST LAB x5031 received

$20.5 million from former JP Morgan Chase Bank FAST LAB account x8615. Both accounts have been determined to have collectively received more than $47,000,000.00 in proceeds of CEMHAN BIRICIK and Martin Perlin's illicit scheme to defraud the Medicare program

209.   Given the facts outlined herein, probable cause exists to seize the 2023 Lamborghini Urus (VIN: ZPBUC3ZLXPLA25853 as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956).  It was determined that at least $20.5 million in likely fraud proceeds was deposited into the account used to purchase the vehicle. As such, the vehicle is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

### 2023 Audi Q3 (VIN WA1EECF36P1144452)

210.   On July 22, 2023, BIRICIK purchased a cashier's check (No. 1175434310) drawn on funds from former JP Morgan Chase Bank Mavric 672082663 in the amount of $44,306.19 made payable to Audi Coral Springs for the purchase of a 2023 Audi Q3 for BIRICIK's daughter, Isabella Biricik.  The vehicle is registered to Isabella Biricik, the spouse of Cemhan Biricik, at the subject's residence.

211.   From 2022 through 2023, over $2 million was transferred, directly and indirectly, from former JP Morgan Chase Bank FAST LAB account 8615 and JP Morgan Bank FAST LAB x3722 to JPMorgan Chase Bank Account 672082663, Mavric Marketing Associates LLC (Mavric x2663).  Mavric x2663 was opened on December 11, 2020, and the signer listed on the account was BIRICIK. Investigation and analysis determined, since 2022, Mavric x2663 has been nearly fully funded, both directly and indirectly, by the previously identified accounts, FAST LAB x8615 and FAST LAB x3722.  A review of x2663 bank records identified BIRICIK as a Manager of Marvric and only authorized signer on the account. Between these accounts and others identified herein, it has been determined Fast Lab has collectively received more than $47,000,000.00 in proceeds of CEMHAN BIRICIK and Martin Perlin's illicit scheme to defraud the Medicare program for services they did not provide.

212.   Given the facts outlined herein, probable cause exists to seize the 2023 Audi Q3 (VIN WA1EECF36P1144452) as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). As such, the vehicle is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C.

§ 2461.

## 2024 BMW M4 (VIN: WBS33BA02RCP10794)

213.   On September 13, 2024, BIRICIK purchased a cashier's check drawn on funds from Bit Byte Bit x5978 in the amount of $110,764.91 made payable to BMW of Delray for the purchase of a 2024 BMW M4.  The vehicle was registered to BIRICIK's wife, Isabel Biricik.

214.   From April 2023 through May 2023, over $246,887.34 was transferred from the JP Morgan Chase Fast Lab Gusto Payroll account to Bit Byte Bit x5978. JPMorgan Chase Bank Account 939265978, Bit Byte Bit LLC (Bit Byte Bit x5978) was opened on April 4, 2023. The signers listed on the account were BIRICIK and his wife, Isabel Biricik.

215.   Investigation and analysis determined, between April 2023 through May 2023, this account received approximately $246,887.34 in transfers JP Morgan Chase Bank FAST LAB account x5978 was opened, it received at least $246,887.34 in transfers from the JP Morgan Chase Bank Gusto payroll account, which was funded by fraudulently obtained payments from Medicare and Medicaid for services Fast Lab did not provide. Specifically, Fast Lab received more than $47,000,000.00 in proceeds of CEMHAN BIRICIK and Martin Perlin's illicit scheme to defraud the Medicare program for services it did not provide.

## 2025 Cirrus SR22T aircraft, bearing tail number 203FD, S/N: 10395

216.   On or about January 30, 2025, Isabel Biricik posted a video on social media showing Isabel Biricik and BIRICIK exiting a vehicle that was driven into an aircraft hangar to accept ownership of a SR22T Cirrus aircraft bearing tail number 203FD.

217.   This aircraft appears to have been purchased with fraud proceeds.  As detailed above, on January 27, 2025, Biricik instructed Dennis.Lee@morganstanley.com to wire $1,154,250.00 to Cirrus Design Corp to complete the purchase of the Cirrus aircraft bearing tail number 203FD.  That email contained the following invoice:



**CIRRUS AIRCRAFT**
4515 Taylor Circle
Duluth, MN  55811
218.727.2737 tel | 218.788.3881 fax

**INVOICE**

| Cemhan Biricik | | | | |
|---|---|---|---|---|
| 9623 Macchiato Ave | **SERIAL NUMBER:** | 10395 | **N NUMBER:** | N203FD |
| Boca Raton, Florida 33496 | **INVOICE DATE:** | 12/4/2024 | **DELIVERY DATE:** | 1/30/2025 |
| | **PREPARED BY:** | S. Pierce | **RSD:** | M. Conway |
| | **ERP #:** | 27476 | **SO #:** | 373049 |
| | **SPC#:** | 69 | **MODEL:** | SR22T GTS |
| | **DELIVERY LOCATION:** | Knoxville, TN | **DOM/INTL** | DOM |

| | | |
|---|---|---:|
| | **BASE PRICE:** | $1,174,900.00 |
| **ADDITIONAL AIRCRAFT OPTIONS** | | |
| Air Conditioning | | 39,900.00 |
| Cirrus Global Connect | | 16,900.00 |
| Hartzell 4 Blade Composite Prop | | 24,900.00 |
| **SUB TOTAL OPTIONS** | | **$81,700.00** |
| **SUB TOTAL WITH OPTIONS** | | **$1,256,600.00** |
| **OTHER PRODUCTS** | | |
| 4th & 5th Yr Spinner to Tail Warranty Upgrade | | 25,900.00 |
| **SUB TOTAL  OTHER PRODUCTS** | | **$25,900.00** |
| **SUB TOTAL PRIOR TO DEDUCTIONS** | | **$1,282,500.00** |
| **DEDUCTIONS** | | |
| **SUB TOTAL DEDUCTIONS** | | **$0.00** |
| **TOTAL PURCHASE PRICE** | | **$1,282,500.00** |
| | | 0.0000% |
| **TOTAL NET TAXABLE INVOICE AMOUNT** | | **$1,282,500.00** |
| SALES TAX (if Domiciled in Tennessee) | | |
| State Sales Tax | @ | 0.00 |
| City / Local Sales Tax | @ | 0.00 |
| **SUB TOTAL SALES TAX** | | **$0.00** |
| **TOTAL AIRCRAFT PRICE** | | **$1,282,500.00** |
| **SUB TOTAL OTHER FEES AND CHARGES** | | **$0.00** |
| **TOTAL BEFORE PAYMENTS** | | **$1,282,500.00** |
| **RECONCILIATION** | | |
| Aircraft Order Deposit | | $15,000.00 |
| Progress Payment | | $113,250.00 |
| Progress Payment | | |
| Progress Payment | | |
| Final Payment | | |
| Other | | |
| **SUB TOTAL PREPAYMENTS** | | **$128,250.00** |
| **BALANCE DUE AT DELIVERY** | | **$1,154,250.00** |

218.   On November 22, 2024, BIRICIK transferred $113,000 from former JP

Morgan Chase Bank FAST LAB repository account 772378615, to his personal

account, BIRICIK x5125. The same day, BIRICIK sent a $113,250 wire transfer to

Cirrus Design Corporation. This wire transfer was a payment toward a 2025 Cirrus Design Corporation SR22T bearing tail number 203FD, Serial Number 10395. *See* "Progress Payment" on the invoice above. FAA records show the aircraft is registered to BIRICIK at his personal residence.

219. From April 2024 through May 2024, BIRICIK transferred over $11 million from FAST LAB x5031 to two Brokerage Accounts and approximately $325,000 to Mavric x2663.

220. On September 26, 2024, BIRICIK transferred $3,049,000 from one of the two Brokerage Accounts to JPMorgan Chase Bank account 922685125 (BIRICIK x5125). BIRICIK x5125 was opened on January 27, 2023, and signers listed on the account were both BIRICIK and Isabel Biricik. Additionally, on the same day, September 26, 2024, a wire transfer in the amount of $1,951,000 from a Morgan Stanley Brokerage account owned by BIRICIK was transferred to BIRICIK x5125. Investigation and analysis determined in 2024 BIRICIK x5125 was nearly fully funded by and received over $5.5 million, both directly and indirectly, from FAST LAB x8615 and FAST LAB x3722.

221. As detailed above, both the Morgan Stanley and Chase accounts that Biricik controls were funded with fraud proceeds. As such, it is reasonable to believe that the funds utilized to purchase the 2024 SR22T Aircraft, was derived from the proceeds of Biricik and his co-conspirators' illicit scheme to defraud

107

numerous health insurance programs.

222.   Given the facts outlined herein, probable cause exists to seize the 2025 Cirrus SR22T aircraft, bearing tail number 203FD, S/N: 10395, as proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or as property involved in money laundering (18 U.S.C. §§ 1957 and 1956). As such, the asset is subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

## **<u>CONCLUSION</u>**

223.   Given the magnitude of the illegal activities involved in this scheme, and based upon the information contained in this Affidavit, there is probable cause to believe that the **Target Assets** represent the proceeds of health care fraud (18 U.S.C. § 1347) and conspiracy to commit the same (18 U.S.C. § 1349); and/or property involved in money laundering (18 U.S.C. §§ 1957 and 1956).

196.   I am aware that Title 18 U.S.C. § 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b) and may be executed in any district in which the property is found.

224.   I am aware that Title 28 U.S.C. § 1355(b) authorizes the filing of a

forfeiture action in the District Court for the district in which any of the action or omission giving rise to the forfeiture occurred.

225.     There is probable cause to believe that the funds in the Target Assets are proceeds of and/or are involved in the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to commit the forgoing offense in violation of Title 21, United States Code, Section 846; and money laundering in violation of Title 18, United States Code, Sections 1956 and 1957.  Therefore, these assets are forfeitable civilly to the United States Government under Title 21, United States Code, Section 881(a)(6) and Title 18 United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C), and forfeitable criminally under Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1).

226.     Your affiant requests that warrants be issued to seize, for purpose of civil and/or criminal forfeiture, each of the Target Assets.

227.   Your Affiant requests that each financial institution at which the Subject Accounts are established be instructed to provide federal agents with the current account balance upon seizure, as follows:

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the federal agents authorized to seize the funds.**

109

## REQUEST FOR SEALING

228.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Kevin Clark
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Honorable Elizabeth A. Stafford
United States Magistrate Judge

Dated:  July 29, 2025

AUSA:   K. Craig Welkener          Telephone:   (313) 269-4796

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture   Special Agent:   Kevin Clark          Telephone:   (313) 378-7149

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*
2023 Audi Q3, VIN: WA1EECF36P1144452, and all sets
of keys and operating manuals used to operate the vehicle

Case No.   2:25-mc-50997-2
Judge: Lawson, David M.
Filed: 07-29-2025

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Southern _____ District of _____ Florida _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

2023 Audi Q3, VIN: WA1EECF36P1144452, and all sets of keys and operating manuals used to operate the vehicle

The authority for seizure of property that is located outside of the district where the warrant is being issued is found in 28 U.S.C. § 1355(b) and 18 U.S.C. § 981(b)(3).

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before  August 12, 2025
                                                                                                                            *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty _____ .
                  *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days (not to exceed 30)   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   July 29, 2025   5:41 pm

*Elizabeth A. Stafford*
*Judge's signature*

City and state:   Detroit, MI

Elizabeth A. Stafford          U. S. Magistrate Judge
*Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*